David D. Miller (State Bar No. 66863)
Nicholas S. King (State Bar No. 179605)
Patricia I. James (State Bar No. 90633)
MILLER, KING & JAMES, LLP
ATTORNEYS AT LAW
707 Broadway, Suite 1800
San Diego, CA 92101-5314
Telephone: 619.685.0077
Facsimile: 619.685.0011

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DARRYL MURRAY and DEBRA MURRAY,<br><br>Plaintiffs,<br><br>v.<br><br>HOST INTERNATIONAL, INC., and DOES 1-100, Inclusive,<br><br>Defendants. | CASE NO.:07CV2056-H (BLM)<br><br>PLAINTIFFS' NOTICE OF LODGMENT IN SUPPORT OF THEIR MOTION TO COMPEL DEPOSITIONS, ANSWERS TO DEPOSITION QUESTIONS AND PRODUCTION OF DOCUMENTS<br><br>Date: September 5, 2008<br>Time: 2:00 p.m.<br>Courtroom: 5, Third Floor<br>Magistrate Barbara L. Major |

Plaintiffs DARRYL MURRAY and DEBRA MURRAY hereby submit their Notice of Lodgment in Support of Their Motion to Compel Deposition and Answers to Deposition Questions:

Exhibit A: A true and correct copy of pertinent pages from the deposition transcript of Idalia Castro, taken on July 18, 2008.

Exhibit B: A true and correct copy of pertinent pages from the deposition transcript of Joseph Lutz, taken on July 25, 2008.

///

///

///

Exhibit C: A true and correct copy of pertinent pages from the deposition transcript of Elie Maalouf, taken on July 25, 2008.

Dated: 8-18-08

MILLER, KING & JAMES, LLP

By: ______________________
David D. Miller
Nicholas S. King
Patricia I. James
Attorneys for Plaintiffs

CERTIFIED COPY

# THORSNES LITIGATION SERVICES

Transcript of the Testimony of:

# Idalia Castro

**Date:** July 18, 2008

**Volume:** I

**Case:** Murray v. HMS Host

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

EXHIBIT A

want to assume anything.

Were there just three people that conducted this investigation when you took over, yourself, Tom Stein, and Rod Taylor, or were there more?

A. Just the three of us.

[redacted].

Q. And Cecilia Hoatson was the senior person of those making that decision; is that correct?

A. That's correct.

Q. And the instructions were somewhat general, that the three of you would go to San Diego and assess the situation, correct?

A. We would interview and assess the situation, yes, and report back to corporate.

Q. When you say "report back to corporate," who specifically, Cecilia Hoatson or someone else?

A. Cecilia Hoatson.

Q. Anyone else?

A. Then she needs to report back to whoever she reports to, which is Chuck Powers and ultimately Ellie Maalouf. And also involved in this whole decision making is or was at that time Joe Lutz, which is Darryl Murray's direct boss.

Q. Joe Lutz was involved in the decision to investigate?

A. Not in the decision to investigate, but the ultimate decision of what would happen with the result of the investigation.

Q. So that would have been Cecilia Hoatson, Chuck Powers, Ellie Maalouf, and Joe Lutz.

Anyone else?

A. At the end of the time, we were talking to people, but the investigation was still ongoing. We had to review the notes. We had to talk about it and all that. We had to discuss it with the VP, his boss.

Q. Let me get a little clarification on this.

Your investigation took -- I am starting to forget things. You said two or three days, how long?

A. Two days.

[redacted]

Q. So the recommendation, is it fair to say, was contrived in the meeting of the three of you; is that correct?

A. Yes.

Q. And then who made the phone call to

A. Yes.

Q. And do you have any additional reasons for the suspension?

A. As I said, because our policy when we conduct an investigation, we have a right to suspend someone during the course of the investigation so that there will not be any interference.

And when it comes to someone who is in a position of authority, we remove them so there is no further -- so that nothing else happens during the investigation until we clear it up.

Q. You just told me that another reason, an additional reason, was because you wanted to prevent Darryl Murray from interfering with the investigation, but you told me the only things left in the investigation were your review of the notes, corporate's review of the file, and your talking with Joe Lutz.

[redacted]

///

BY MR. TAPPE:

[redacted]

[redacted]

BY MR. TAPPE:

Q. I am just asking where the information would be obtained. I am not asking -- well, I am even allowed to ask what the information is. I am asking where it is stored in a custodian fashion on the Internet and how someone would access it, where the link is.

A. It's our intranet.

Q. Is there a link to this policy handbook?

A. Yes.

Q. Where's the link on the web page?

A. Where is the link?

Q. Hypothetically, if I was an employee and had access and you told me, "Go look up something in this handbook," how would you tell me to go find the link? How would you do that?

A. HR handbook.
[redacted]
Q. What are --
A. Oh, I'm sorry. Not reasons why, but it says -- it tells you how to suspend or why we suspend.
Q. And is that the reference that you relied upon for your authority to suspend Darryl Murray?
A. Is that the reference?
Q. Is that the written authority that you relied upon to -- let me just retract that question because it was Cecilia Hoatson who eventually made the decision to suspend Darryl Murray, correct?
A. Exactly.
MS. RASKIN: Can I interrupt for just one minute?

level of the president at least potentially?

MS. RASKIN: Objection. Asked and answered. Go ahead.

THE WITNESS: I don't know.

BY MR. TAPPE:

Q. So based on your experience, you don't -- okay.

[redacted]

Q. So she had no direct role.

It was going to be you and Joe Lutz, correct?

A. Yes.

Q. And what, during this three-way call, did Cecilia Castro(sic) advise Joe Lutz or you to tell Darryl Murray regarding his reason for termination?

[redacted]

Q. And what reason was given for termination on the notice of termination that was given to Darryl Murray?

A. I don't have it in front of me. So I don't remember.

[redacted]

Q. And from that point on, he was officially terminated?

A. That's correct.

Q. And then what happened next?

CERTIFIED COPY

# THORSNES LITIGATION SERVICES

Transcript of the Testimony of:

## Joseph Lutz

**Date:** July 25, 2008

**Volume:** I

**Case:** Murray v. HMS Host

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

EXHIBIT B

my follow-up questions; is that correct?

[redacted]

Do you want to do the stipulations?

MR. TAPPE: Well, we are not going to do the normal stipulations because the deposition is incomplete. So I would like to enter on the record that I was not allowed to ask all the questions I have of the witness.

So the deposition is not complete. With that being on the record, do you have any ideas what you want to do with this transcript?

MS. RASKIN: The deposition is complete from my standpoint. So I would stipulate to the usual stipulations and have Joe review his transcript, have the transcript come to my office. I will forward it to Joe. He can review. He will have 30 days to review his transcript and make any changes that he -- any corrections that he sees necessary.

And then we will forward that back to the court reporter's office to incorporate into the transcript. If he fails to do that, then you may use

years with the company. He was previously the general manager that was in charge of our John Wayne Airport as well as our Ontario Mills Mall.

Joe has an excellent background for results, success in our organization. He did extremely well as he went through the interview process, answering the questions. So he surfaced as the lead candidate.

[redacted]

MS. RASKIN: You had two hours just as we agreed. Now I am entitled to follow-up with a couple questions.

MR. TAPPE: No, because we are ending the deposition early before I have had a chance to complete my questions. Follow-up questions come in sequence after I have finished with the witness, as the person who called the deposition. That is quite clear procedure.

MS. RASKIN: You are not going to let me ask

Q. Who is Bruce Fish?

A. Bruce Fish was at the time the general manager at LAX.

Q. How were people selected to be on the interview panels?

A. I select them based on their experience and background and some knowledge of the area, market, generally a well-respected general manager from an operation representation. HR is typically represented and myself. Sometimes I include our controller, our regional controller.

Q. Is there any policy that dictates who should and should not be selected on these interview panels?

A. There is no policy, no. My discretion.

Q. Who was selected to take over the position after Kuldip Johal was the acting general manager?

A. Joe Niknam.

[redacted]

years. He -- I don't recall exactly but 10 or 12

[redacted]

Q. Was Idalia Castro the one who typed the termination notice in Darryl Murray's case?
A. Like I said, I don't recall. It should --
Q. Say again.
A. I said, it should be easy enough to find out. I assume he has it.
Q. We will talk about that, too.
But it was your decision to terminate, and you have someone else type up the termination notice,

question asked him what Chuck was thinking. So you are asking him to speculate. So I am telling him he doesn't have to put himself in Chuck's head. He just has to remember what Chuck said to him.

So go ahead and answer.

[redacted]

BY MR. TAPPE:

Q. Let's presume hypothetically a sexual harassment did occur.

[redacted]

A. I am not sure she said anything. She said she understood.

[redacted]

CERTIFIED COPY

# THORSNES LITIGATION SERVICES

Transcript of the Testimony of:

## Elie W. Maalouf

**Date:** July 25, 2008

**Volume:** I

**Case:** Murray v. HMS Host

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

EXHIBIT C

Q Do you remember who first told you about a negative situation with Darryl Murray?

A I'm not certain, exactly.

[redacted] and/or Joe Lutz together or separate. That I can't recall. But it's likely between the two of them.

Q Okay. And do you recall the general substance of what you first learned about Darryl Murray?

A Not specifically. But I'm sure that the actual events reflect that substance.

Q I think I understand what you're saying.

I'm more curious about what was actually told to you, whether you recall that.

A That I'm -- I'm not able to recall the specifics. But what was said at the time, I can't tell you. What I can say is that I'm certain it's not very different than what transpired.

Q Well, there is some question about what transpired which is why, you know, I'm asking what was told to you. Plus, in this case there are various aspects and it's entirely unclear, at least to me, you know, what was actually told to who. So, you know, I'm

What's your understanding of policies that apply when a senior general manager is investigated and eventually terminated?

A I don't understand the question.

Q You said you expect your employees to follow the policies for investigating and terminating an employee like Darryl Murray or a manager like Darryl Murray.

A I said I expect our employees to generally, not all cases, to follow all of our policies and procedures.

[redacted]

A [redacted]

[redacted]

Q Well, I think those are two separate policies.

A I didn't refer to two policies. I only referred to one policy. The measures are what we used to enforce the policy. I'm referring to only one

[redacted]

A Your question was hypothetical. If I had known why. I didn't know. I didn't ask. And it's not a circumstance that can occur.

Q Well, it actually did occur. That's why I'm asking the hypothetical.

A The circumstances of me knowing something that I didn't know that can occur and -- I can't -- I can't surmise what I would have thought had I known something that I didn't know then. It doesn't matter.

[redacted]

Q Well, if you knew there was a legitimate reason for a kiss -- I mean, certainly not all kisses are sexual harassment.

[redacted]

Q No. I would create the hypothetical circumstance and then ask you -- okay. Let's just try

[redacted]

Q Well. I'm not asking you to go through a hypothetical of every single circumstance. And you characterize my hypotheticals as things that didn't or could not occur. And I would, by way of argument --

A The information, I did not have that information. That's what did not occur. And whether that information is true or false, I don't know and it doesn't matter. I did not have such information. And I can't -- and I can't provide you with a reaction now to something I did not have two years ago.

Q Well, sir, this is discovery process. I'm opposing counsel. And I'm allowed to determine what's relevant to myself, my client and the case. So when I ask you a hypothetical question, it's not proper to respond that my hypothetical is irrelevant because that's a matter for my determination.

Chuck Powers calls you --

A The hypothetical had various twists to it that I have not faced before. And I'm unable to -- to consider a reaction to that.

[redacted]

MS. RASKIN: I'm just not getting a chance to object here. But I think that Elie is objecting to -- the reason he has a hard time answering this question is because there's a contradiction in that question there in terms of Host's policy regarding zero tolerance. And you're --

MR. TAPPE: I'm going to have to object to you testifying for the witness. The witness can tell me the