# EXHIBIT 1

Certified Copy

STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

DARRYL MURRAY and DEBRA MURRAY,

Plaintiffs,

vs.

Case No.
3:07-CV-02056-H-BLM

HOST INTERNATIONAL, INC. and DOES
1-100, Inclusive,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF DARRYL MURRAY

SAN DIEGO, CALIFORNIA

MARCH 25, 2008

Reported by Cindy Cameron, CSR No. 10315, CCR No. 671

PAULSON
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Appearances:

For Plaintiffs:

Miller, King & James, LLP
By: David D. Miller, Esq.
707 Broadway, Suite 1800
San Diego, California 92101-5314
(619) 685-0077 Fax (619) 658-0011

For Defendants Host International, Inc.:

Bailey Law Group, PC
By: Kathy Bailey, Esq.
1615 L Street, Suite 1350
Washington, DC 20036
(202) 887-8040 Fax (202) 887-8044
kbailey@baileylawgroup.com

-and-

Bailey Law Group, PC
By: Serafina Raskin, Esq.
8105 Irvine Center Drive, Suite 900
Irvine, California 92618
(949) 453-1755 Fax (949) 453-1757
sraskin@baileylawgroup.com

DEPOSITION OF DARRYL MURRAY, taken at Paulson Reporting & Litigation Services, 555 West Beech Street, First floor, San Diego, California on Tuesday, March 25, 2008, at 9:13 a.m., before Cindy Cameron, Certified Shorthand Reporter in and for the County of San Diego, State of California.

I N D E X

WITNESS: Darryl Murray


| EXAMINATION | PAGE |
|---|---|
| By Ms. Bailey | 6 |

PLAINTIFF
DARRYL MURRAY
Murray, et al., v. Host International, Inc., et al.
Tuesday, March 25, 2008
Cindy Cameron, CSR No. 10315, CCR No. 671

INDEX TO EXHIBITS


| EXHIBIT | | MARKED |
|---|---|---|
| 1 | Second Notice of Deposition Duces Tecum to Darryl Murray No Bates | 8 |
| 2 | First Amended Complaint For Violation of Fair Employment and Housing Act; Wrongful Discharge in Violation of Public Policy; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing and Loss of Consortium No Bates | 9 |
| 3 | Diary and Work Record No Bates | 10 |
| 4 | Interoffice Memorandum to Jack Vogel from John Dettl dated August 28, 1996; Interoffice Memorandum to Darryl Murray from Jack Vogel dated August 28, 1996 No Bates | 29 |
| 5 | HMSHost Associate Handbook No Bates | 33 |
| 6 | HMSHost Corporation Non-Harassment Policy and Policy Against Sexual Harassment No Bates | 33 |
| 7 | HMSHost Policy Against Sexual Harassment; HMSHost Associate Acknowledgement, Non-Harassment Policy and Policy Against Sexual Harassment No Bates | 33 |

INDEX TO EXHIBITS (Continued)

| EXHIBIT | | MARKED |
|---|---|---|
| 8 | Letter to Darryl R. Murray from Vince Modica dated December 13, 1999; Letter to Daryl from Paul Kolze dated 5/24/00 No Bates | 37 |
| 9 | Interoffice Memorandum to Jennifer Lakin from Darryl Murray dated September 5, 2006 No Bates | 48 |
| 10 | Interoffice Memorandum to Chuck Powers, Joe Lutz, Cecilia Hoatson, and Idalia Castro from Thomas Stein dated September 20, 2008 No Bates | 50 |
| 11 | Interoffice Memorandum to Jennifer Lakin from Darryl Murray dated January 17, 2003; Interoffice Memorandum to Darryl Murray from Jennifer Lakin dated January 15, 2003 No Bates | 74 |
| 12 | Statement To Whom It May Concern from Jerry W. Shelby dated Wednesday, September 6, 2006 No Bates | 89 |

Q Why did you leave that position?
A I really don't remember. It was 1980.
Q Did you resign or were you terminated?
A No, I -- I resigned that position.
Q So you started to work for Host Marriott in the fall of 1988, right?
A Actually -- well, it was either the fall or the winter. It was December of '88.
Q Okay. Sorry.
During the time that you worked for Host Marriott and all of its successor names, how many times do you think you went to any kind of employee training?
MR. MILLER: You mean formalized?
MS. BAILEY: Any kind of training.
MR. MILLER: It's overbroad as phrased.
BY MS. BAILEY:
Q Do you understand the question?
A Yeah, I understand the question.
Q Okay.
A But it's just -- I've gone to food training. I've got to accounting training. It would be countless times. I -- I couldn't even begin to try to estimate the number of times.
Q More than five a year?
A Some years, yes. Some years, no.

MR. MILLER: I'm going to object to the form of the question, because it doesn't define what training is. But answer to the extent you're comfortable.

THE WITNESS: There was always some sort of either seminar or formalized training going on.

BY MS. BAILEY:

Q When did you first have a management position at Host?

A From the day I was hired.

Q Did you have specialized management training once you were there?

A No. I was given the keys and said this is my area of responsibility.

Q All right. Once you were employed there, did you attend management training?

A At JFK?

Q Well, once you were employed at JFK, did you attend management training anywhere in the company?

A Yes, I'm quite sure I did. I really -- I remember, up front, the amount of training was pretty negligible in the beginning.

Q Do you remember if the training and experience that you did attend included training in sexual-harassment issues?

A Eventually, it did.

Q "Eventually" meaning when, do you think?

know, that's off the top of my head.
BY MS. BAILEY:
Q Let's walk through your positions that you've held At the Host and its predecessor.
What was your position immediately before your termination?
A General manager of the food and beverage concessions in San Diego international airport.
Q Tell me the job responsibilities with that job.
A Well, just as the title states, general manager, I was responsible for all of the day-to-day operations, including the staffing and training of the staff; P&L responsibilities; responsible to maintain the standards in the branch and to see that we achieve the goals that the company set forth.
Q What sort of training were you responsible for?
A All facets, from sanitation, server training, accounting training, human-resources training.
There was, every year, a checklist would come out of the training that the organization wanted us to fulfill for the hourly associates and for the management associates.
Q And did the HR training include a discussion of harassment?
A Yes, it did.
Q Did you conduct that training?

A No, I did not.
Q Who conducted it?
A The HR manager.
Q Did you participate?
A Yes, I did.
Q Was it your job, as the general manager, to enforce Host policies regarding harassment?
A Regarding everything.
Q So in that role, would you have needed to understand the definition of harassment?
MR. MILLER: Well, back to my objection. You're asking him for a legal analysis. I think he's asked -- you've asked and the witness understands that, has given to you.
But you can answer more, if you can.
THE WITNESS: What I also counted on, and not just in the HR realm, is that I had what -- these subject matter experts in every discipline. There was an HR manager; there was a controller; there was a commissary manager; there was a maintenance manager.
I don't pretend to know more about the maintenance than the maintenance manager or more about HR than the HR manager or the accounting procedures of the controller.
BY MS. BAILEY:
Q During the time that you were the general manager,

did you ever discipline an employee for sexual harassment?
A In concert with my HR manager, yes, I did.
Q And who would that be?
A I believe my controller.
Q Do you remember that person's name?
A Robert Mitchell.
Q And what were the facts of that case?
A He had made a comment to an assistant manager that the assistant manager felt were inappropriate. Upon conducting the investigation, Mr. Mitchell said that they were purely innocent.
The general -- the HR manager recommended, at that time, that he be given a warning; and that's what he was given.
Q Was that his first infraction, as far as you were aware?
A As far as I was aware.
Q And how did that --
A And I never reached the conclusion that it was an infraction; that the assistant manager was questioned afterwards and said that she felt it was inappropriate.
Q And how did that complaint come to your attention?
A Through the HR manager.
Q Do you remember the HR manager's name?
A Jennifer Lakin.

would take, who would they go to?

A They would go to the HR clerk and then a rep and then myself.

In that environment, things were a lot more informal than they were when they became larger.

Q And do you recall if any member of management was subject to a claim of sexual harassment while you were at the airport?

A No, I do not remember at all.

Q Do you remember whether any hourly employees were subject to any sexual-harassment claims while you were at that airport?

A In Portland?

Q Correct.

A I do not believe so.

MS. BAILEY: Hold on for just one moment.

Off the record for a second.

(Discussion held off the record.)

MS. BAILEY: Back on the record, then.

Would you take a look at these two documents? We're going to label them together as Exhibit 4.

(Whereupon Exhibit 4 was marked for identification.)

BY MS. BAILEY:

Q Are you familiar with these documents, Mr. Murray?

A This document (indicating), I have never seen

before, the first --
Q The one that's the memo to Jack Vogel from John --
A Dettl.
Q -- Dettl?
A Okay. And I remember something along this line, but I don't remember the specifics of this document.
Q And that is the one, you're saying --
A That is made out to me.
Q -- that had been made out to you from Jack Vogel?
A Right.
I remember there being a document. I remember going to Mr. Vogel's office in Detroit and receiving that.
Q Do you remember what the subject matter is of this memo?
A Nobody ever told me what the incident was. At no time did anybody say what the allegation was, who made the allegation. I was accused of making inappropriate comments, but wouldn't -- was never told what the comments were or who they were to.
Q So at the point --August 1996, at this point in time, where were you working at that point in time?
A Columbus airport.
Q And the last paragraph of this memo from Jack Vogel to you says "As the new general manager in Columbus, I expect you to facilitate to all associates the sexual-harassment

president of the company.

Q Could you take a look at this document?

(Whereupon Exhibit 5 was marked for identification.)

THE WITNESS: Okay.

BY MS. BAILEY:

Q Do you recall this document from the time you were employed there?

A I can't say that I remember every line in the document, but I remember some -- something to this effect.

Q Do you see the very first page of this document is the nonharassment policy?

A Yes.

Q Is there any part of this policy that you believe did not apply to you as a manager?

A I believe that all the policies apply to -- or supposedly apply to everybody who works there.

Q What about the second page, the policy against sexual harassment, did you believe that that applied to you?

A Yeah, of course.

Q Let's flip over to the next page. And, in fact -- let me see.

Here's this one. We're going to mark these all as Exhibits 6 and 7.

(Whereupon Exhibits 6 and 7 were marked for identification.)

///

BY MS. BAILEY:
Q Do you remember these two documents, Mr. Murray?
A Yes, I do.
Q And the most recent one was signed in March of '05; is that correct?
A Correct.
Q Is that your signature there?
A Yes, it is.
Q And that's the same document that's reflected in this exhibit we were just looking at as the third page in this exhibit, correct?
A If you say so. I haven't done line --
Q I'm not trying to trick you, but --
A Well, I haven't gone line by line --
Q Okay.
A -- but I'll take for granted it is.
Q Okay. And Item No. 3 -- the only reason I would prefer to read it out of the exhibit is because it's a little easier to read than this photocopy of a photocopy of a photocopy.
But Item No. 3, do you see that: "Sexual and/or other forms of harassment by any associate will result in corrective action up to and including termination."
A Yes, ma'am.
Q Did you agree to that when you signed this in

2005?

A I believe so.

Q And, again, in Point No. 8, "If a complaint has been determined to be factual, appropriate corrective action will occur up to and including termination."

Do you see that sentence?

A Yes, I do.

Q So when you signed this in 2005, were you agreeing to that sentence?

A Yes, I was.

Q Is there any reason now you believe those things were not -- you were not agreeing to those two statements?

A No, I do not.

Q Can you flip over to Page 3 of that document, please? Do you see the second item -- the second bullet point on that page? That's an example of nonverbal sexual harassment?

A Nonverbal or the unwelcome physical contact.

Q Well, the whole page is examples of nonverbal sexual harassment?

A Oh, okay.

Q And that particular one is unwelcome physical contact?

A Okay.

Q Do you disagree that unwelcome physical contact is

a form of sexual harassment?

A No, I do not.

Q And then if you flip over to Page 15, you'll see at the bottom half of that page, there's a section called "Think about your own actions and how they might be interpreted."

A Uh-huh.

Q And it says "Think about situations that might lead to claims of sexual harassment or inappropriate behavior, even when nothing sexual, offensive, or unwanted is intended."

And then there's a couple of bullet points in there, including one that says "One-on-one situations away from the operation, especially if they occur at night or involve alcohol."

Do you believe that that could -- is a situation that could result in a claim of sexual harassment or inappropriate behavior?

A Sure.

Q Similarly, the last bullet point: "Jokes and comments of a personal, sexual nature," you agree that that could amount to sexual harassment?

A Yes.

Q When you first went to work for Host, the predecessor Host, in 1988 -- correct?

A Correct.

Q -- did you have an employment contract with them?
A No, I did not.
Q Did you ever, during the time that you worked for Host, have an employment contract?
A I don't know what would constitute an employment contract. I know that I had several written agreements that, when I relocated, I needed to fulfill or there would be -- they stated I needed to stay employed for X amount of time or the consequences would be A, B, C.
Q Did Host ever make a promise to you of continued employment?
A No.
Q Can I ask you a question, too?
As we were reading through these letters that represent different positions that you had, there was -- we'll go ahead and mark this one as an exhibit. This is the 1999 letter.
Do you have copies of that one?
MS. RASKIN: Uh-huh.
MS. BAILEY: Of course you do. It's a rhetorical question.
And then following that, the 2000 letter.
(Whereupon Exhibit 8 was marked for identification.)
BY MS. BAILEY:
Q Can you take a look at these two letters, please?

We're going to mark those Exhibit 8.

A Okay.

Q Could you explain to me the position that you held starting in May of 2000?

A This -- never saw this before in my life. I'm not qualified to be an IS consultant. This isn't me.

Q Okay. So --

A I also doubt very much if I would take a $900-a-week pay cut as a career advancement.

Q That's what I was going to ask you about.

A Yeah, that -- this isn't me. And, as you can see, there's nothing that ever says it's me.

Q Okay. Keep that in your pile so we don't get confused.

A Okay.

Q So you went directly from the position of director of food and beverage to the director -- the general manager in San Diego; is that correct?

A Correct.

Q Did anyone at Host ever make a verbal promise to you about a guarantee of employment under any circumstances?

A Not that broadly.

Q In some other way?

A Conversation was held that if I went back into operations, that I wouldn't have to move around so much.

Because I had two little children, and I had moved six times for the company.

Q Operations being what part of the company?

A As the general manager, being an operator as opposed to a staff person.

Q And did you go back into operations at that point?

A Yes, I did.

Q And did you have to move as much?

A No. I was -- didn't have to move at all until the last year of my employment.

Q All right. Other than that, were any other promises made to you?

A No.

Q When we met last time, I think you said that you and your wife own a restaurant in Maine; is that correct?

A Correct.

Q When did you acquire that restaurant?

A May of 2007.

Q What's the name of the restaurant?

A The Freedom Cafe.

Q Where is it located?

A In Naples, Maine.

Q Are you the sole owners?

A Of -- of the business, I am.

Q Do you receive any income from that business?

A I left there in December.
Q Were you terminated or did you resign?
A My position was eliminated.
Q And since December, have you been employed anywhere else?
A No, I have not.
Q When did you start to work for Creative Host?
A In May of 2007.
Q So from the time that you left Host in December -- I mean in the fall of 2006 until May of 2007, were you unemployed that entire time?
A Correct.
Q All right. Let's go back to the exhibit that is the complaint, Exhibit 2. I want to walk through a couple of these paragraphs with you, make sure I understand your complaint.
Okay. If you look at Page 3 of the complaint -- oh, I'm sorry, that's Exhibit 1. We need Exhibit 2?
A It would be at the bottom of the stack. It should be.
Q No. It's disappeared.
A Here it is (indicating). I have it.
Which page?
Q Okay. If you look at Page 3, Paragraph 12, Paragraph 12 says "The fact that Darryl was over 40 years old

was a substantial factor in Host's decision to terminate Darryl's employment."

Can you tell me the basis of that belief?

A That the amount of time on job -- and I had reached a certain point in my life where my salary was pretty high.

As a matter of fact, my direct superior even made the comment that "We don't give deals like that out any longer."

And once I was removed, the person behind me was younger than me. But more so than that, he was replaced by somebody quite a bit younger than him.

Q Who was the person who immediately succeeded you?

A Gentleman named Joe Niknam.

Q The comment about "We don't make deals like that anymore," what was your understanding of what that meant?

A It was a level of discomfort of the relo package that I received from the company and the level of compensation I received for the size of the branch I was running.

Q Did anyone ever ask you to take a cut in pay?

A No. I was asked to move.

Q From San Diego?

A Yes.

Q When were you asked to move?

A I was asked several times, in the spring of 2006,

complaints were from both Mr. Chadwick and Ms. Rosales?

A No, he didn't. He asked me my side of the story.

Q He didn't tell you anything about the issues they had raised?

A No. He twisted the words and he said, "What if I told you this," and "What if I told you that somebody wrote a statement that said that?" Never came out and stated anything.

Q Do you disagree with his statements in this memo of what your position was? Understanding that the first ones are difficult to read. I understand that.

MR. MILLER: Well, yeah. It's overbroad as phrased.

That's a long memo that he drafted.

MS. BAILEY: Take your time.

MR. MILLER: Take your time.

THE WITNESS: Okay.

MR. MILLER: She's asking you globally.

THE WITNESS: Okay. I can't see the first paragraph, so I don't know what he's saying there.

BY MS. BAILEY:

Q Well, let me -- let me read you the first bullet point, and you can tell me whether you agree or disagree that this is what you told him.

Bullet Point 1 says "Darryl initially admitted

kissing Sandy at the party, stating it was a hug and a kiss goodbye, like he did to a number of other associates who was there."

Do you agree or disagree with that?

A I agree.

MR. MILLER: Did he say that to Mr. --

MS. BAILEY: Stein.

MR. MILLER: -- Stein?

THE WITNESS: If he states -- says so. I don't remember having that conversation.

MR. MILLER: Well, her question is, is that what you recall that you said to Mr. Stein?

THE WITNESS: I don't remember what I said to Mr. Stein. As I said, I was in a meeting with him for over three hours and --

BY MS. BAILEY:

Q Well, do you agree that as a fact, it's correct that you remember --

A Yeah.

Q -- kissing her?

A I remember kissing several associates goodbye on my way out the door.

Q And the second --

A And she was --

Q I'm sorry.

A -- one of about four of them.
Q The second bullet point has nothing to do with the statement that you made: "No other associates acknowledged being kissed by Darryl at the party. Darryl claims he hugs and kisses a lot of the associates here, but never on the lips, other than Sandy."
A I never said that.
Q Is it true?
A No.
Q And then it goes on to say "When asked" -- and this is, again, his statement, not yours -- "When asked how many other times that has occurred, he backed off the statement by saying he's not even sure he kissed her on the lips that night. He claims he's not sure why it happened, but he didn't think anything about it until he heard the rumors upon arranging" -- I think he means arriving -- "at work on Monday, the 28th."
Do you remember saying anything to him about hearing rumors when you arrived at work on Monday, the 28th?
A When I arrived at work the 28th, the only thing that I heard was that Darin Chadwick was angry with me and was stating, in the airport, he was going to, to use Darin's words, kick my ass.
Q Next bullet point: "Darryl acknowledged he should never have gone to the party, because it was at an

warnings; and just taken aback that a long-term employee, on an allegation of this sort, somebody would be fired for it.

Q In fact, you had gotten a warning for -- based on the sexual-harassment claims from Portland, Maine, in 1996; is that correct?

A Okay. I think we already covered that. I think I told you that nobody ever even told me what that allegation was.

And that warning was given to me when I was in Columbus, Ohio.

Q Right.

But it was based on allegations made against you in Portland, correct?

A Correct, correct.

Q And do you recall a woman by the name of Leticia Sevedra?

A Sure do.

Q Was she an employee at Host in San Diego?

A Yes, she was.

Q Do you recall the complaint that she filed against you?

A Actually, she didn't file a complaint against me. What she did was, I believe she filed a warning with the state employment agency, saying that she reserved the right to go place a complaint.

I think she was -- and I turned that over to the HR department.

Q Do you recall what the nature was of her complaint?

A Yeah. I believe an investigation was held, and it ended there was no -- there was finding that there was no -- nothing happened.

Q Do you recall what the nature was of her complaint?

A She said something happened at a Christmas party, that I danced with her at a Christmas party.

During the course of the investigation, I had brought up that she filed that right after she was disciplined by me.

Q Can you take a look at these two documents?

And we'll have them marked as Exhibit 11.

(Whereupon Exhibit 11 was marked for identification.)

BY MS. BAILEY:

Q Are you familiar with these two documents, Mr. Murray?

A Yes, ma'am.

Q Can you tell me what they are?

A After the investigation was held -- well, this one (indicating), I believe, was -- I don't know if this was before or after. The dates seem to be transposed; that this one on January 17th is my answer to the allegations, and this

on January 15th talks about concluding the investigation.

So I'm kind of confused as to how there could be a conclusion to the investigation two days before my answer to the allegations took place. So that -- that confuses me.

I remember when it was concluded, and it was held by another -- Tom Leisure, I believe, was the gentleman who conducted this investigation. And he had a conference with me -- and I don't remember the date -- saying that as far as he knew, nothing -- nothing took place; and that was the end of that.

At that point, I remember making a phone call to Mr. Powers, asking for a letter saying that the investigation was concluded and that I was exonerated.

And his statement was "We don't do that. We just do findings if somebody is found to be guilty of it."

Q And do you agree that in this particular case, the claims of Leticia Sevedra, that a complete investigation was conducted?

MR. MILLER: Calls for speculation.

THE WITNESS: I wouldn't know, because nothing was ever shared with me afterwards.

I'd asked Mr. Powers for his written conclusion; and he said -- once again, I'll state, he said that "We don't do that."

///

REPORTER'S CERTIFICATION

I, Cindy Cameron, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were recorded stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this date: April 10th, 2008.

/s/ Cindy Cameron

Cindy Cameron, CSR 10315, CCR 671