HOST MARRIOTT SERVICES

INTEROFFICE MEMORANDUM

**DATE:** August 28, 1996

**TO:** Jack Vogel

**FROM:** John Dettl

**CC:** Tom O'Hare

**SUBJECT:** Darryl Murray

As we discussed yesterday, attached is a draft warning for Darryl as a result of the investigation at Portland.

Darryl was contacted by Cecilia Hoatson and Sharron Dean to review the allegations and to give him the opportunity to respond. They advised him of their findings and told him the final disposition (i.e., verbal warning, written warning, etc.) would be up to Jack Vogel and/or Tom O'Hare.

Please let me know if we need to discuss this.

Attachment

Track______ Exhibit 4
Date 3-25-08
Witness Murray
C. Cameron 3 Page(s)
CCR #671 / CSR #10315

4-1

HOST MARRIOTT SERVICES

INTEROFFICE MEMORANDUM

**DATE:** August 28, 1996

**TO:** Darryl Murray

**FROM:** Jack Vogel

**CC:** Tom O'Hare, John Dettl

**SUBJECT:** Written Warning - Sexual Harassment Allegations, Portland, Maine

As you have been made aware, an investigation was conducted in Portland, Maine in July. The investigation was conducted by Sharron Dean stemming from two anonymous calls received on our Business Abuse Hotline. The allegations charged you with sexual harassment while you were General Manager at the Portland, Maine airport.

The conclusion of our findings indicated that there were behaviors, comments and conduct that were perceived as inappropriate by many associates. This may have stemmed from you initiating or allowing an atmosphere of bantering and socialization that sometimes included sexual innuendoes inside and outside the workplace. The behaviors allowed in the workplace were considered by others as being offensive.

I know that these allegations came as a surprise to you since you are no longer at that Branch. Our findings revealed that the associates respected you and appreciated your commitment to their developmental growth. However, many associates stated that they were still uncomfortable with the overall environmental issues that grew as a result of unprofessional behavior. As a General Manager, you are held accountable to a higher standard.

In a conversation with Human Resources, you stated that you are fully cognizant of the Company's Non-Harassment, Sexual Harassment and Ethical Conduct Policy and even facilitated orientation to new hires and current associates. Your professionalism and dealings with associates in the future must improve. As the new General Manager in Columbus, I expect you to facilitate to all associates the sexual harassment prevention workshops at the Branch as soon as possible.

Page 2 - Continued
Written Warning - Darryl Murray

You are a talented operator and have a lot to offer the organization. I expect clear and demonstrative improvements in your behavior immediately. I hope that this experience has heightened your awareness to the seriousness of the Company's posture on these policies. Any future actions/inactions by you in the future may result in further disciplinary actions not to exclude termination.

| | | | |
|---|---|---|---|
| Darryl Murray's Signature | Date | Witness | Date |

| | |
|---|---|
| Jack Vogel's Signature | Date |

Jan 13 2006 9:37AM HMS HUMAN RESOURCES 6192872437 No. 4093 P. 1

Policy acknowledgement

CONFIDENTIAL

# HMSHOST POLICY AGAINST SEXUAL HARASSMENT

*Associate agreement for HMSHost Operating Group Non-Harassment Policy and Policy against Sexual Harassment*

HMSHost operating group is committed to providing a workplace that is safe, comfortable and free from harassment. It is HMSHost's policy to prohibit all forms of harassment at work, including harassment based on age, race, color, religion, sex, sexual orientation, national origin, disability or veteran status.

All associates are responsible for complying with *HMSHost Operating Group Non-Harassment Policy and Policy Against Sexual Harassment*.

(1) The company's policy against sexual harassment prohibits unwelcome sexual advances, requests for sex (with or without related threats or promises of favors or other benefits) or other verbal or physical sexual conduct that could have a harmful effect on your work performance or create a hostile or offensive work environment.

Examples of "sexual harassment" include, but are not limited to:

- Obscene or sexually suggestive comments about a person's body
- "Off-color" language or "dirty" jokes of a sexual nature
- Slurs, threats, comments, or other offensive verbal or physical conduct relating to a person's sexual orientation.
- Offensive or unwelcome sexual flirtations, advances or propositions communicated verbally or in writing
- Use of sexually degrading words to describe a person or group of people
- Any display of sexually explicit photographs, drawings, greeting cards, articles, books, magazines or other printed items
- Unwelcome or unnecessary touching of any part of another person's body

(2) Sexual and other forms of harassment at work are strictly prohibited, whether committed by associates (management or nonmanagement), vendors, guests, clients or customers. Under HMSHost operating group policy, managers and supervisors cannot threaten or imply that giving into or rejecting sexual advances will influence any decision regarding employment.

(3) Sexual and other forms of harassment by any associate will result in disciplinary action up to and including immediate termination and may lead to personal legal and financial liability. Associates are strongly encouraged to use the company's *Guarantee of Fair Treatment* complaint procedure if they believe they have

Track_____ Exhibit 7
Date 3-25-08
Witness Murray
C. Cameron 3 Page(s)
CCR #671 / CSR #10315

ASSOCIATE FILE

7-1

been subjected to any form of harassment at work or during a work-related activity.

(4) Complaints of a sexual nature and other forms of harassment at work will be promptly and carefully investigated. Under HMSHost operating group policy, associates cannot be retaliated against or harmed in any way if a harassment complaint is filed.

(5) If there are concerns about harassment at work by anyone, including managers, supervisors, co-workers, guests, clients, customers or visitors these concerns should be brought immediately to a manager or supervisor's attention. Note: A sexual harassment questionnaire will be provided in order to determine the nature of the situation. However, use of the questionnaire is not required to complain about sexual harassment or for management to address concerns.

(6) If possible, concerns should be brought to the attention of the associate's immediate manager or supervisor. However, if the unwelcome behavior involves a manager or supervisor to whom the associate directly or indirectly reports, assistance can be sought from any other manager, Human Resources, Area or Regional Vice President, Senior Vice President of Human Resources or the HMSHost Operating Group Employee Relations Department at (800) 628-5101, extension 87723.

(7) The company's investigation may include interviews with all persons having direct knowledge of the unwelcome behavior, including the person who made the complaint, the person accused of sexual harassment and other potential witnesses.

(8) The privacy of the associate bringing the complaint forward and the privacy of the person accused of sexual harassment will, to the extent possible, be kept strictly confidential.

(9) At the conclusion of the investigation, the company will communicate the outcome of the investigation with the person(s) who made the complaint. If the investigation reveals that the complaint is factual, appropriate corrective action will be taken to prevent the harassment from occurring again, up to and including discharge of any associate(s) believed to be guilty of sexual harassment. In any case, particularly in situations where the facts uncovered during the investigation are inconclusive or unclear, management will ensure that all parties are reacquainted with the company's policy prohibiting sexual harassment at work.

1/17/03

7-2

Sep. 15. 2006 9:37AM HMS HUMAN RESOURCES No. 4093 P. 3

# HMSHOST ASSOCIATE ACKNOWLEDGEMENT
# NON-HARASSMENT POLICY AND
# POLICY AGAINST SEXUAL HARASSMENT

HMSHost Corporation, Host International, Inc., and subsidiary companies are committed to providing you with a workplace that is safe and free from harassment based on race, color, creed, age, religion, gender, sexual orientation, national origin, disability, or veteran status.

All associates are responsible for complying with the HMSHost Corporation *Non-Harassment Policy* and the *Policy against Sexual Harassment*. Copies of both policies are attached and you should read them carefully before you sign the Associate's Acknowledgement form.

1. The Company's policy prohibits unwelcome sexual advances, requests for sex, and other verbal or physical sexual conduct.

2. Sexual and other forms of harassment at work are strictly prohibited whether committed by associates, vendors, guests, clients or customers.

3. Sexual and/or other forms of harassment by any associate will result in corrective action, up to and including termination and may lead to personal legal and financial liability.

4. Bring your concern to the attention of a manager immediately and notify your Human Resources representative so a thorough investigation can be conducted.

5. Complaints of sexual and other forms of harassment will be investigated. You cannot be retaliated against in any way if you choose to file a harassment complaint.

6. Remember that simply telling a co-worker is insufficient in terms of notifying management. In order for an investigation to be conducted, management and Human Resources must be informed of your concerns.

7. A sexual harassment questionnaire will be provided. The investigation may include interviews with anyone having direct knowledge of the allegation, as well as the person who made the complaint, the accused, and any other potential witnesses. Your privacy, and the privacy of the person being accused, will, to the extent possible, be kept confidential.

8. Upon concluding the investigation, the Company will communicate with the individual who made the complaint. If a complaint has been determined to be factual, appropriate corrective action will occur, up to and including termination. In situations where the results are inconclusive or unclear, all involved parties will be reacquainted with the Company's policy prohibiting any form of harassment while at work.

9. If you feel you have been the victim of any form of harassment while at work, you are strongly encouraged to report the complaint to management, and to utilize either the Company's Guarantee of Fair Treatment or Speak-Up-For-Ethics line at 1-888-Speak11.

## Associate Acknowledgement

I, Darryl Monaly, have read the Company's Non-Harassment Policy and Policy against Sexual Harassment, and agree not to engage in any form of unlawful harassment as described therein. I also acknowledge that, on the date below, I received copies of both policies for my personal use and future reference.

Today's Date: 3/3/05 Associate Signature: [signature]

7-3

HOST MARRIOTT SERVICES

Host Marriott Services Corporation
6600 Rockledge Drive, Dept. 860.30
Bethesda, MD 20817
301/380-1019
301/380-1310 Fax

Vincent J. Modica
Vice President, Operations Standards

December 13, 1999

Darryl R. Murray
1555 Comanche Road
Arnold, Maryland 21012

Dear Darryl:

I am delighted to confirm in writing my verbal offer to you for the position of Director, Food & Beverage reporting to me. The following information summarizes the details of this offer:

- Your base salary will be $1,692.74 per week, effective December 4, 1999.
- You will participate in the Host Marriott Services Bonus Plan which has a norm payout of 20% and a max payout of 30%.
- Your next performance/merit review date will be December 4, 2000.

As you know, in the ordinary course of business, pay and benefit plans and company employment policies and practices continue to evolve as business needs and laws change. To the extent that it becomes necessary and desirable for the Company to change any of the plans in which you participate, or any of its employment policies and practices, such changes will apply to you as they do to others. This letter is not a contract or guarantee of employment.

To accept this offer, which supersedes all prior employment related commitments which may have been made in the course of your employment, please sign and date one of the two letters and return it to me in the envelope provided. Please do not hesitate to contact me with any questions you may have regarding this information.

I am excited about you being selected for this new position and for your continued contributions to the growth of Host Marriott Services Corporation.

Sincerely,

Vince Modica
Vice President
Food & Beverage Standards

Track ______ Exhibit 8
Date 3-25-08
Witness Murray
C. Cameron 2 Page(s)
CCR #671 / CSR #10315

I accept the above offer and I understand the terms as set forth above.

Signed: ____________ Date: 12/13/99
Darryl R. Murray

RECEIVED
DEC 13 1999
12/13

8-1

HMS
HOST

5/24/00

Dear Daryl: Murray

I am delighted to confirm in writing my verbal offer to you for the position of IS Consultant II. The following information summarizes the details of this offer:

- As 6/2/00, you report to Paul Kolze, IS Director.
- Your base salary will be $ 721.15 /week, effective 6/2/00.
- Your next performance/merit review date will be 12/2/00 with an annual review thereafter.

As you know, in the ordinary course of business, pay and benefit plans and company employment policies and practices continue to evolve as business needs and laws change. To the extent that it becomes necessary and desirable for the Company to change any of the plans in which you participate, or any of its employment policies and practices, such changes will apply to you as they do to others. This letter is not a contract or guarantee of employment.

To accept this offer, which supersedes all prior employment related commitments which may have been made in the course of your employment, please sign and date one of the two letters and return it to me. Please do not hesitate to contact me with any questions you may have regarding this information.

We are excited about you being selected for this position and for your continued contributions to the growth of HMSHost.

Sincerely,

Paul Kolze
IS Director

I accept the above offer and I understand the terms as set forth above.

Signed: ______________________ Date: ______________
{Associate's Name}

RECEIVED
JUL 27 2000
7/27

8-2

HMS HOST

*INTEROFFICE MEMORANDUM*

**DATE:** September 20, 2006

**TO:** Chuck Powers, Joe Lutz, Cecilia Hoatson, and Idalia Castro

**FROM:** Thomas Stein

**SUBJECT:** Notes from Darryl Murray Interview on 9/19/2006 regarding the kissing of Sandy Rosales on 8/26/2006, the removing of Darin Chadwick – AMII from position on 8/28/2006 and the tip jar program to offer free money to union associates

- Darryl initially admitted kissing Sandy at the party stating it was a hug and kiss goodbye like he did to a number of other associates who were there.
- No other associates acknowledged being kissed by Darryl at the party.
- Darryl claims he hugs and kisses a lot of the associates here but never on the lips other than Sandy.
- When asked how many other times that has occurred, he backed off the statement by saying he's not even sure he kissed her on the lips that night. He claims he's not sure why it happened but he didn't think anything about it until he heard the rumors upon arranging at work on Monday the 28th.
- Darryl acknowledged he should never have gone to the party because it was at an associate's house and stated he's never done that before.
- Darryl stated he only talked to Darin once at the party and that was as he was leaving to say hi and goodbye.
- Darryl denies that he told Darin he was dressing Sandy like a school girl and that he thought that was very sexy.
- Darryl claims Sandy asked he and Jerry Shelby not to leave; nearly begging them to stay and insisted they come back to the party
- Darryl states Sandy told him Darin was abusing her and he was concerned for her safety. He hugged and kissed her as they were leaving because she was looking like she was going to start crying again. Darryl told her he would come back or at least call her to check in on her.
- Darryl stated he's called Sandy repeatedly over the years for business and personal reasons. Anytime Sandy called him, he would call her back like he does for every associate when they call him.
- Darryl denies telling Darin he would "Kick his ass" while in the elevator on Monday the 28th, as he was taking Darin down to the Cooler to have a private conversation with him regarding the rumors Darin was spreading about Darryl kissing his girlfriend at the 8/26 party.
- When in the cooler, Darryl told Darin he never kissed Sandy on the lips and that Darin must have been mistaken. Darin confronted him with the fact that he was three feet away watching it happen and Darryl than stated it was only a peck; nothing sexual was meant by it.
- Darryl states the decision to pull Darin out of his acting SM role was made the previous week and it was already set to happen on Monday the 28th.
- Darryl admits prefacing the discussion with Darin about moving him from the acting position with the statement, "This has nothing to do with what we discussed earlier." That was said to insure Darin didn't think it was in response to Darin spreading rumors about Darryl kissing his girlfriend

Track________ Exhibit 10
Date 3-25-08
Witness Murray
C. Cameron 2 Page(s)
CCR #871 / CSR #10315

10-1

- Darryl claims he had a sit down casual and undocumented conversation with Darin the prior month about his performance. Neither Darin nor Kuldip, the AMII who is acting AGM and Darin's immediate supervisor, have any knowledge of that conversation nor is it documented anywhere. Darryl acknowledges he never documented any of Darin's progress, whether good or bad as he claims he was leaving that up to Kuldip. He had no justification for pulling him out other than the manager who he replaced Darin with was failing miserably in his current role so he wanted to give him a smaller and easier location to run.
- Darryl claims he assured Darin he would receive a development plan after being moved out of the Acting SM role to get him ready to be a SM but that has not been developed or administered to date.
- Darryl claims he promised and gave Darin a 5% raise for becoming an AMII and acting SM but Darin states he only received a 5% increase based on his performance evaluation in April.
- Darryl admitted dancing in a provocative manner at the last Christmas party stating, "I dance like people dance today, there's nothing sexual about it; and I just like to dance."
- When asked if any of his manager or associates have ever counseled him on his behavior because they felt it was inappropriate, he stated that happened this summer while out for dinner with associates and managers. Adrianna told him she didn't appreciate comments he made about Mexican food. Darryl stated he couldn't recall whether or not he was ever confronted by anyone else.
  We know he was and by his AGM at the Christmas party this year because of the way he was dancing with Sandy in such a provocative and sexual manner.
  Darryl also admitted knowing Darin who was an AMII was dating Sandy who was one of Darin's direct reports. The only thing Daryl said to him was to be careful, keep it away from the branch and don't let it interfere with your work.
  Darryl admitted fronting Sandy $500 $600 to go to Bartending School last year. [illegible] told her to get a check for the school from Jennifer Pakin, cash it and give him back the money. Darryl stated that did happen but believes she paid him by check. When asked how many other associates he had done that for the answer was none.

TIP JAR Issue

- Darryl has maintained a tip jar campaign that boasts it will help our HMSHost associates go to school. Darryl claims it was approved by Jack, Jean Mario and Mike Hasenzahl when he was still here.
- Tip jars are on every register, funds are deposited into a charity account, he and two managers decide each month which Union Associates should receive money, only pays $500 at the max to anyone and limits how many times associates can receive money. Fund is to be used for school and makes associates write an essay as to why they deserve the money but doesn't know whether it's really for school. Darryl thought there was $7,000 in the account but there's actually $17,000 in that account. The associates are given a tax free check.
- Darryl also admits he gives other donations out of that account and buys charity silent auction gifts for his managers from that account every year. He also realizes there is already a budgeted amount on his P&L for charitable contributions and community service type donations. Darryl claims he never thought about the discriminatory method of disbursing funds to the associates nor did he know it was a violation to give money to associates without it being taxed or reported to the govt.
- When reviewing the list of checks paid out of that account over the last few years, in excess of $500, Darryl had no idea what the larger amounts of money were for.

Darryl acknowledged he now has to change his behavior because he realizes sexual harassment and inappropriate behavior is in the eye of the accuser. Even though he didn't mean anything by his forwardness he realizes it has been perceived to be sexually harassing and somewhat discriminatory in nature. Darryl stated he needs to know whether he's going to be terminated because he needs to takes steps on his own to protect himself.

______ = information that changed from his initial interview with Idalia

HMS HOST

**INTEROFFICE MEMORANDUM**

**DATE:** January 17, 2003

**TO:** Jennifer Lakin

**FROM:** Darryl Murray

**CC:** file

**SUBJECT:** Answer to allegations

In response to the allegations made by Leticia Saavedra I categorically deny any inappropriate behavior as outlined in her complaint. As the General Manager for HMSHost in the San Diego International Airport I conduct myself in a professional manner.

Darryl R. Murray

Track______ Exhibit 11
Date 3-25-08
Witness Murray
C. Cameron 2 Page(s)
CCR #671 / CSR #10315

11-1

No. 4095 P. 1/1
Sep. 13. 2006 9:44AM HMS HUMAN RESOURCES
JAN-17-2003 02:14PM FROM-HMSHOST HUMAN RESOURCES 8192072487 T-130 P.001/003

HMS HOST

**INTEROFFICE MEMORANDUM**

**DATE:** January 15, 2003

**TO:** Darryl Murray

**FROM:** Jennifer Lakin, Human Resources Manager

**CC:** Vernon Adams, Sr. Manager, Employee Relations
Idalia Castro, Sr. Human Resources Field Manager

**SUBJECT:** Sexual Harassment Concerns/Issues

1. I have reviewed the issues that were raised from employee, Leticia Saavedra regarding concerns of harassment directed toward her from you.

2. After reviewing the information provided, a thorough investigation was conducted and has been concluded regarding the issues. Although the witnesses that were mentioned could not corroborate the allegations, we take all claims of sexual harassment seriously. As a preventative measure, we will be providing harassment training to all managers within the next three months, which include appropriate behavior and appropriate reporting procedures when claims of harassment are brought forth. In addition, we will take other appropriate action that is deemed necessary to respond to behavior that may be perceived as harassment. We are also re-issuing the sexual harassment policies and procedures and ask that you adhere to them, as we ask of all associates.

3. The contents of this investigation are confidential and will be disclosed only to those individuals who have a legitimate business need to know.

4. If in the future, you obtain additional information, which you believe might impact the decision made in this investigation please let me know immediately.

5. Thank you for your cooperation in this investigation and unless other concerns are brought forth, the investigation is now closed.

Received [signature] Date 1/17/03

11-2

HMS HOST

**INTEROFFICE MEMORANDUM**

**DATE:** September 5, 2006

**TO:** Jennifer Lakin

**FROM:** Darryl Murray

**SUBJECT:** Statement regarding Darin Chadwick

On Saturday, August 26th, I met with Jerry Shelby to go to the San Diego Charger game. We met at his home at which time he received a phone call from Sandra Rosales inquiring if we were be attending a wedding celebration for Claudia Gallegos. When Mr. Mr. Shelby asked if I wanted to attend I told him that we could stop there but I wanted to attend the football game. We stayed at the celebration for about an hour and were about to leave when Ms. Rosales arrived.

Ms. Rosales was visibly upset and asked us both not to leave and that her boyfriend, Darin Chadwick, was abusing her. Both Mr. Shelby and I asked her if it was physical abuse. She said no, that it was mental abuse at which time we offered encouragement and told her to remove herself from the situation. At this time Darin arrived and was also visibly upset. I greeted him with a handshake and told him good bye at the same time. We then headed out the back door to our car when Ms. Rosales approached us again and asked us not to leave. We said we were going to the game and might return. I told her that if we weren't coming back, I would let her know. We said our good-byes and that was the last we saw of both her and Darin for the evening.

Over the course of the evening we heard from Ms. Rosales at which time I called her back to say that we were still at the game. I also inquired if she was okay. She said that she would call us back. We never spoke again that evening.

I came to work on Monday, August 28th, and was approached by several managers who told me that on Sunday, Darin was telling everyone who would listen that I had tried to "put the moves" on Sandy on Saturday night. I told them thank you but not to listen to idle gossip. When I was informed that he was continuing such talk on Monday I decided to ask him myself. I went to his area, the NFL, and asked him if we could talk privately. We went downstairs and when we got there a security man was present as well as some prep people. I asked him if we could go into the cooler for privacy and he agreed.

While in the cooler, I asked him if he was saying the things I had heard and if so, why? He stated that he did say them because he saw me put a "lip lock" on Sandy and that I kept calling her throughout the evening. I told him that he was mistaken. I told him that I did not put a "lip lock" on her. I also informed him of Sandy's initial call to Shelby, her allegations of abuse, and her request for us not to leave or for us to return. He seemed completely surprised. I also told him, that if he thought I was "making the moves" on her he was mistaken. I questioned the wisdom and appropriateness of his having a

LAKIN 1

Track______ Exhibit 9
Date 3-25-08
Witness Murray
C. Cameron 2 Page(s)
CSR #671 / CSR #10315

9-1

relationship with Ms. Rosales. Finally, I informed him that it was not professional to go to fellow associates, hourly or management, to complain and make allegations of a personal nature and that he should come to me or go to HR with such concerns. At no time did I threaten him or act in a threatening manner. We then shook hands and parted on amicable terms.

With regards to the decision to change Darin's role in our branch; it was made previously to August 28th and was completely independent of anything but his performance. I had spoken to Darin three week's earlier at which time he was informed of his shortcomings as a potential Store Manager and he agreed that he was put into a leadership position too soon. During the week of August 21st, a discussion was held between Kuldip, you, and I whereas the decision to move him out of an "Acting Store Manager" role was finalized as was the timing of the move.

Darin knew that his Acting Store Manager role was temporary and that at summer's conclusion his role would be changed. When Darin's role was originally changed his status was also changed to AM II to reflect his expanded responsibilities at which time he received an increase in compensation. During the Monday, August 28th, afternoon meeting between Kuldip, Darin, and I, he was informed that his title (AM II) and compensation (including $50 cell phone re-imbursement) would remain as is. He was informed that he was not demoted but was being re-assigned to assist Adriana's team during Stan's vacation. Any and all communication throughout the branch would say as much. He was thanked for all of the work he did over the summer and he was directed to work with Kuldip to create a personal development plan to get officially promoted. Once again, the meeting ended amicably.

LAKIN

9-2