**Miller, King & James, LLP**
Attorneys At Law

David D. Miller †
Nicholas S. King +
Patricia I. James ‡

Washington Mutual Building
707 Broadway, Suite 1800
San Diego, California 92101
Tel: 619.685.0077
Fax: 619.685.0011

† Board Certified Civil Trial Specialist by the National Board of Trial Advocacy
+JAG Certified
‡ Also Licensed in Colorado

September 8, 2008

Serafina Raskin, Esq.
Bailey Law Group
8105 Irvine Center Drive, Suite 900
Irvine, CA 92618

Sent via U.S. Mail and Facsimile to
949.453.1757

*Re: Murray v. Host International, Inc.*

Dear Ms. Raskin:

On Friday, September 5, 2008, Judge Major ordered your client to produce documents that were identified by defense witnesses at their depositions. It was made clear that Plaintiffs must carefully specifically identify the documents requested before the obligation to produce will be ripe.

Below is a list of eight documents that were identified by Defendant Employee witnesses at their depositions. With each specified document is a short description of the document. Below each name/description is a deposition reference for each document requested (both quoted and cited).

With this letter, Plaintiffs have been as specific as they can in describing and referencing the documents that must be produced pursuant to the Court's Order on September 5, 2008. In many cases, these descriptions are as detailed as Defendants employees were willing to be at time of deposition.

If you require further definition and specificity to identify the referenced documents and produce them, please respond with your concerns in writing. Further, each of the eight documents identified are referenced by a specific deponent. Since each deponent is a current employee of HOST, it would be a simple matter for defense counsel to contact these deponents for any further assistance needed to locate and produce the documents.

This matter of document production is time-sensitive. I do not recall Judge Majors setting forth a deadline for production when she ordered Defendants to produce the additional documents.

Exh 12

However, this letter is being sent via facsimile in order to expedite the process. If you anticipate that you cannot produce each of the specified documents within one week, please call my office to discuss. If you have any questions about this important matter please do not hesitate to call or email.

Thank you for your continued cooperation.

MILLER, KING & JAMES, LLP

Todd N. Tappe

DOCUMENTS DESCRIBED BY PLAINTIFFS SO THAT DEFENDANTS CAN LOCATE AND PRODUCE, PURSUANT TO JUDGE MAJOR'S ORDER OF SEPTEMBER 5, 2008:

**Documents identified by San Diego Human Resources Manager, Jennifer Lakin, in her deposition, taken July 15, 2008:**

**1) Computerized "termination notice" from Darryl Murray's record in the electronic human resources system.**

"I could probably look up his record in the human resources system, but it would not give specifics. It would most likely say either "violation of rules" or "gross misconduct," (Lakin Dep., 47:6-10).

**2) Darryl Murray's training record from the Peoplesoft Training Program.**

"Q. . . . tell me about this Peoplesoft training program. A. Okay. It is basically a data entry program where we input the employee number. It brings up their record. We put in the course description, and each course has its own description. So for sexual harassment we have a course number. For bloodborne pathogens we have a number. We input that. We input the date that they were trained. It assigns a course session number. We save it, and we are done. . . . Q. Is there a hard copy record of the Peoplesoft training records? A. You could probably print it out." (Lakin Dep., 61:5-25).

**3) The "HR Handbook for Managers,"** specifically the one identified by Jennifer Lakin as containing the **"termination policy."**

"Q. Is there a separate policy [separate from the sexual harassment policy] for handling of terminations? A. A termination policy? Q. Yes. A. Yes. It's more of a guideline, not a policy.

And it kind of guides you on what, you know, actions to take and what issues could be considered for termination. Q. Where is that policy maintained? A. That would be in the HR handbook for managers." (Lakin Dep., 69:2-12).

"Q. . . . the termination policy, I imagine, sets forth thresholds for termination; is that correct? A. Right. It would tell you - - it talks about progressive discipline, you know, documented counseling, first written, second written, final, and then termination. It also talks about instances where you could terminate someone without prior discipline. And I believe sexual harassment is mentioned in there." (Lakin Dep., 70:23 to 71:6).

**4) A "Termination Policy" that is a document separate from the "HR Handbook for Managers."**

"Q. Is there a separate policy [separate from the sexual harassment policy] for handling of terminations? A. A termination policy? Q. Yes. A. Yes. It's more of a guideline, not a policy. And it kind of guides you on what, you know, actions to take and what issues could be considered for termination. Q. Where is that policy maintained? A. That would be in the HR handbook for managers." (Lakin Dep., 69:2-12).

"Q. . . . the termination policy, I imagine, sets forth thresholds for termination; is that correct? A. Right. It would tell you - - it talks about progressive discipline, you know, documented counseling, first written, second written, final, and then termination. It also talks about instances where you could terminate someone without prior discipline. And I believe sexual harassment is mentioned in there." (Lakin Dep., 70:23 to 71:6).

**5) The "Sexual Harassment Investigative Guideline" - the one that lists the various types of sexual harassment.** (The Guideline is distinguished from the sexual harassment guideline that merely lists prohibited acts in the Employees' HR Handbook).

". . . we also have a sexual harassment - - the investigative guideline. So basically it goes over what could be considered sexual harassment, what type of harassment it could be, and then it - - you know, of course, like I said, we have a zero tolerance policy. So that means termination." (Lakin Dep., 69:22 to 70:2).

**6) The "Zero Tolerance Policy" for sexual harassment** that may be part of the "Sexual Harassment Investigative Guideline."

". . . we also have a sexual harassment - - the investigative guideline. So basically it goes over what could be considered sexual harassment, what type of harassment it could be, and then it - - you know, of course, like I said, we have a zero tolerance policy. So that means termination." (Lakin Dep., 69:22 to 70:2).

**Documents identified by Western Regional Human Resources Manager, Idalia Castro, in her deposition, taken July 18, 2008:**

**7) The "Internal Policy" of limited access that contains suspension policy,** specifically the policy referenced during the suspension and termination of Darryl Murray.

"Q. Your policy that allows you to suspend people during an investigation, where do I find this policy? A. It's in our HR policies and handbook of reasons why we suspend people. Q. Is that on the Internet? A. It might be. Q. Whats the Web site where I can find that? A. It is in our intranet, not the Internet. I'm sorry. Q. What's the intranet? How would I get to the intranet link for this HR policy handbook? A. You can't. Q. Not me. Where would somebody who has access - - how would they do that? A. It's in our internal policy. It is also in our HR handbook. . . . Q. And in this HR handbook, it sets forth reasons why you can suspend an employee, correct? A. Yes. Q. What are - - A. Oh, I'm sorry. Not reasons why but it says - - it tells you how to suspend or why we suspend." (Castro Dep., 180:13 to 182:15)

**8) The "Suspension Policy," specifically the one that tells a manager how and why to suspend an employee.**

"Q. Your policy that allows you to suspend people during an investigation, where do I find this policy? A. It's in our HR policies and handbook of reasons why we suspend people. Q. Is that on the Internet? A. It might be. Q. Whats the Web site where I can find that? A. It is in our intranet, not the Internet. I'm sorry. Q. What's the intranet? How would I get to the intranet link for this HR policy handbook? A. You can't. Q. Not me. Where would somebody who has access - - how would they do that? A. It's in our internal policy. It is also in our HR handbook. . . . Q. And in this HR handbook, it sets forth reasons why you can suspend an employee, correct? A. Yes. Q. What are - - A. Oh, I'm sorry. Not reasons why but it says - - it tells you how to suspend or why we suspend." (Castro Dep., 180:13 to 182:15)

TRANSMISSION VERIFICATION REPORT

TIME : 09/08/2008 13:28
NAME : DAVID D MILLER
FAX : 6196850011
TEL : 6196850077
SER.# : BROL2J856089

| | |
|---|---|
| DATE,TIME | 09/08 13:26 |
| FAX NO./NAME | 19494531757 |
| DURATION | 00:01:35 |
| PAGE(S) | 05 |
| RESULT | OK |
| MODE | STANDARD ECM |


# Miller, King & James, LLP

*Attorneys At Law*

Washington Mutual Building
707 Broadway Suite 1800
San Diego, CA 92101-5314
Phone 619-685-0077
Fax 619-685-0011


# FAX COVER SHEET

To: Serafina Raskin, Esq.
Bailey Law Group

Fax Number: 949.453.1757

From: Christina M. Ford for Todd N. Tappe

Date: September 9, 2008

Client/Matter: Murray v. Host International, Inc.

Number of Pages* Sent: 5, Including cover sheet

**DOCUMENTS SENT:**
Correspondence re Production of Documents

COMMENTS:

Original/copy, when finalized, will be sent by:

_X_U.S. MAIL ___FEDERAL EXPRESS ___MESSENGER __ WILL NOT BE SENT

If you do not receive the entire telecopy, please call 619-685-0077 during the hours of 8:30 a.m. to 5:00 p.m.

**Miller, King & James, LLP**

*Attorneys At Law*

Washington Mutual Building
707 Broadway Suite 1800
San Diego, CA 92101-5314
Phone 619-685-0077
Fax 619-685-0011

# FAX COVER SHEET

To: Serafina Raskin, Esq. Fax Number: 949.453.1757
Bailey Law Group

From: Christina M. Ford for Todd N. Tappe

Date: September 9, 2008

Client/Matter: Murray v. Host International, Inc.

Number of Pages* Sent: 5, Including cover sheet

| **DOCUMENTS SENT:** |
|---|
| Correspondence re Production of Documents |
| |

COMMENTS:

Original/copy, when finalized, will be sent by:

_X_U.S. MAIL ___ FEDERAL EXPRESS ___ MESSENGER __ WILL NOT BE SENT

If you do not receive the entire telecopy, please call 619-685-0077 during the hours of 8:30 a.m. to 5:00 p.m., Monday through Friday.
This communication is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us at the above address via the U.S. Mail service.
Transmission of this document is not intended as a waiver of any attorney/client or other privilege.

Q. At any later time, did anyone tell you the reasons for Darryl Murray's termination?

A. No.

Q. Do you have any way of knowing the reason for Darryl Murray's termination?

A. I don't have access to his file. I could probably look up his record in the human resources system, but it would not give specifics. It would most likely say either "violation of rules" or "gross misconduct," but those are broad. So it would not give specifics.

Q. Did you ever look at Darryl Murray's record in the HR system?

A. No.

Q. Did you make any assumptions about the reason that Darryl Murray was terminated?

A. Yes.

Q. And what assumptions did you make?

A. Based on the information that I had available to me during the investigation, I assumed that it was for sexual harassment. And based on the fact that Darryl had a previous case on sexual harassment -- actually, I believe two other cases -- I assumed that that was the reason why.

Q. And you based this assumption on your

Exh 13

Q. Do you recall faxing or mailing the training files to Seattle for entering into the employees' file?

A. No, I don't recall.

Q. Please describe -- well, tell me about this Peoplesoft training program.

A. Okay. It is basically a data entry program where we input the employee number. It brings up their record. We put in the course description, and each course has its own description.

So for sexual harassment we have a course number. For bloodborne pathogens we have a number. We input that. We input the date that they were trained. It assigns a course session number. We save it, and we are done.

Q. How can a person access those training records?

A. They would have to be in Human Resources to be able to access those.

Do you mean on the computer?

Q. Correct, yes.

A. They would have to be in HR.

Q. Is there a way to get a hard copy record of the Peoplesoft training records?

A. You could probably print it out.

harassment policy.
Is there a separate policy for handling of terminations?
A. A termination policy?
Q. Yes.
A. Yes. It's more of a guideline, not a policy. And it kind of guides you on what, you know, actions to take and what issues could be considered for termination.
Q. Where is that policy maintained?
A. That would be in the HR handbook for managers. It would either be a hard copy or on our company intranet.
Q. And you said that the termination policy is either in the handbook or on the company intranet?
A. Intranet, uh-huh.
Q. That policy describes instances where termination would be called for?
A. Yes.
Q. What does that handbook -- what guidance does it give for sexual harassment incidents?
A. Well, we also have a sexual harassment -- the investigation guideline. So basically it goes over what could be considered harassment, what type of harassment it could be, and then it -- you know, of

course, like I said, we have a zero tolerance policy. So that means termination.

Q. What guidance does the termination policy handbook specifically give for the sexual harassment incidents?

A. I believe I would have to read it. I couldn't quote to you off the top of my head.

Q. What's your general recollection of what it says?

A. General recollection would be to conduct an investigation. It explains how to conduct the investigation. I believe it also talks about potential suspension, but, again, I would have to read it.

Q. This is in the termination policy, not sexual harassment?

A. It is in the sexual harassment. I don't know which one it is. They both are very similar. And it basically explains the guidelines for what to do, how to do it. It also talks about getting a sexual harassment questionnaire, you know, from the person that's complaining.

Q. Well, the termination policy, I imagine, sets forth thresholds for termination; is that correct?

A. Right. It would tell you -- it talks about progressive discipline, you know, documented counseling, first written, second written, final, and then termination. It also talks about instances where you could terminate someone without prior discipline. And I believe sexual harassment is mentioned in there.

Q. Is there any record of Darryl Murray receiving progressive discipline?

A. I don't know because I didn't have -- I didn't have information from that previous case. But to my knowledge when I was there, no one ever told me that he was written up.

Q. So is it your understanding that the reason for the termination was an incident that was so serious that termination could result without progressive discipline?

A. That's correct.

Q. So the termination of Darryl Murray was a serious incident termination as opposed to a progressive discipline scenario; is that correct?

A. That is correct.

Q. Aside from the serious incident allegations, are you aware of any other reason that Darryl Murray was terminated?

A. No.

BY MR. TAPPE:

Q. What corporate policy are you referring to?

A. That we can suspend someone pending investigation. And the policy dictates that if we do not terminate this person, we bring them back, and we pay them for the time that they were out.

Q. Does that policy, that allows you permission to suspend someone during an investigation, set forth reasons that should be considered for a suspension?

A. I don't understand the question. I am sorry.

Q. That's easy. I will rephrase that.

Your policy that allows you to suspend people during an investigation, where do I find this policy?

A. It's in our HR policies and handbook of reasons why we suspend people.

Q. Is that on the Internet?

A. It might be.

Q. What's the Web site where I can find that?

A. It is in our intranet, not the Internet. I'm sorry.

Q. What's the intranet? How would I get to the intranet link for this HR policy handbook?

A. You can't.

Q. Not me. Where would somebody who has access -- how would they do that?

A. It's in our internal policy. It is also in our HR handbook.

Q. My question is, where would I find the link if I was an employee for this policy manual that gives the reasons for suspending?

MS. RASKIN: Objection. Proprietary and confidential information.

BY MR. TAPPE:

Q. I am just asking where the information would be obtained. I am not asking -- well, I am even allowed to ask what the information is. I am asking where it is stored in a custodian fashion on the Internet and how someone would access it, where the link is.

A. It's our intranet.

Q. Is there a link to this policy handbook?

A. Yes.

Q. Where's the link on the web page?

A. Where is the link?

Q. Hypothetically, if I was an employee and had access and you told me, "Go look up something in this handbook," how would you tell me to go find the link? How would you do that?

A. HR handbook.
Q. And I would say, "Okay. Where do I find the HR handbook on the intranet?"
What would you tell me?
A. Under human resources.
Q. Is there a further link under human resources?
A. HR handbook.
Q. Okay, thanks.
And in this HR handbook, it sets forth reasons why you can suspend an employee, correct?
A. Yes.
Q. What are --
A. Oh, I'm sorry. Not reasons why, but it says -- it tells you how to suspend or why we suspend.
Q. And is that the reference that you relied upon for your authority to suspend Darryl Murray?
A. Is that the reference?
Q. Is that the written authority that you relied upon to -- let me just retract that question because it was Cecilia Hoatson who eventually made the decision to suspend Darryl Murray, correct?
A. Exactly.
MS. RASKIN: Can I interrupt for just one minute?

## IV.
## MR. MURRAY'S CLAIM FOR AGE DISCRIMINATION UNDER THE FAIR EMPLOYMENT AND HOUSING ACT FAILS AS A MATTER OF LAW

In cases lacking direct evidence of age discrimination, such as this one, circuit courts apply the three-part burden shifting framework of *McDonnell Douglas* in determining whether a moving party is entitled to summary judgment.[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this burden-shifting framework, plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 802. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision. *Id.* Once the employer has articulated a legitimate business reason for its actions, the burden shifts back to the plaintiff to rebut the employer's explanation by showing that the employer's stated reason was a pretext for unlawful discrimination and that a protected category was the motivating reason for the unlawful discrimination. *Id.* Demonstrating that the employer's proffered reason is false is not enough to prove discrimination. Rather, the plaintiff bears the burden of proving that the employer intentionally discriminated against him. *Id.*

A. <u>Mr. Murray Cannot Establish A Prima Facie Case Of Age Discrimination</u>

"To establish a *prima facie* case of age discrimination through circumstantial evidence, the plaintiff must show that he was: (1) a member of a protected class [age 40-70]; (2) performing his job in a satisfactory manner; (3) discharged; and (4) replaced by a substantially younger employee with equal or inferior qualifications." *Nidds*, 113 F.3d at 917, *citing Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir.1990). Here, there is no dispute that Mr. Murray is over 40 and that he was discharged. Mr. Murray, however, has failed to show that he was performing his job duties in a

---

1 In light of the parallel anti-discrimination objectives set out in the FEHA Exh 14 prohibiting age discrimination in employment), courts look to federal co[illegible] Title VII in interpreting the FEHA. *See Etter v. Veriflow Corp.*, 67 Cal. App. 4th 457, 465 (1998); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1998).

satisfactory matter and that he was replaced by a substantially younger person who had inferior qualifications.

### 1. Mr. Murray Has Failed To Show That He Was Performing His Job In A Satisfactory Manner

Every HOST employee is required to abide by HOST's Policy. As a manager, Mr. Murray was especially aware of this Policy because it was part of his responsibilities to enforce it. (UF 19.) Additionally, Mr. Murray received supplemental training on the Policy's application on two previous occasions when he had been accused of sexual harassment by his subordinates. (UF 4-8.) As recently as March 3, 2005, Mr. Murray acknowledged his awareness of and commitment to the Policy when he signed an Associate Acknowledgement of Non-Harassment Policy and Policy Against Sexual Harassment. (Pl's Dep., Ex. 7.)

Despite receiving warnings and additional training on the company's strict non-harassment Policy, Mr. Murray did not heed these warnings. On August 26, 2006, Mr. Murray attended a party at the home of a subordinate employee, Claudia Gallegos. (UF 12). While at the party, Mr. Murray admits that he had inappropriate contact with Sandra Rosales, also a subordinate. (UF 12). When Ms. Rosales reported the incident to HOST, human resources personnel conducted a thorough investigation. (UF 9-13.) They gathered more than enough evidence, including Mr. Murray's own admission and a witness statement from Ms. Gallegos, to determine that Mr. Murray had indeed violated the Policy. (UF 12.) Mr. Murray's violation of this Policy overwhelmingly demonstrates that Mr. Murray was not meeting HOST's standards for its general managers and that his discharge was not only warranted, but necessary under the circumstances.

### 2. Mr. Murray Cannot Show That His Replacement Was Substantially Younger And Had Inferior Qualifications

Mr. Murray has also failed to show that his successor, Joe Niknam, is substantially younger or less qualified. In fact, Mr. Niknam is only four years younger than Mr. Murray and is himself in the

CERTIFIED COPY

# THORSNES LITIGATION SERVICES

Transcript of the Testimony of:

## Joseph Lutz

**Date:** July 25, 2008

**Volume:** I

**Case:** Murray v. HMS Host

Exh 15

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney of party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 1, 2008

Monica M. Frank
MONICA M. FRANK
CSR NO. 11949

Q. I am going to go through this as quickly as I can for efficiency's sake.

Would you please start by telling us generally about your relationship with Darryl Murray before these events of August and September 2006.

A. Sure. My relationship with Darryl I was his direct supervisor, and he was the general manager in the San Diego branch. We had a very good relationship. Darryl is a very likable guy, well-respected. He represented our region in a number of different areas.

One, he represented our region as an alcoholic beverage counsel member, and we have a very select group of tenured, seasoned, respected general managers that I call the operational leadership team. And just a few select people are on that team to help guide and advise me, and he was a member of that. So I would classify my relationship with Darryl as very good.

Q. About how many people were -- I think you have said it.

But about how many people were on your operational leadership team?

A. There is a total of about eight. And of the eight, five of them are general managers. And I have

Case 3:07-cv-02056-H-BLM Document 21 Filed 08/22/2008 Page 11 of 20

satisfactory matter and that he was replaced by a substantially younger person who had inferior qualifications.

1. Mr. Murray Has Failed To Show That He Was Performing His Job In A Satisfactory Manner

Every HOST employee is required to abide by HOST's Policy. As a manager, Mr. Murray was especially aware of this Policy because it was part of his responsibilities to enforce it. (UF 19.) Additionally, Mr. Murray received supplemental training on the Policy's application on two previous occasions when he had been accused of sexual harassment by his subordinates. (UF 4-8.) As recently as March 3, 2005, Mr. Murray acknowledged his awareness of and commitment to the Policy when he signed an Associate Acknowledgement of Non-Harassment Policy and Policy Against Sexual Harassment. (Pl's Dep., Ex. 7.)

Despite receiving warnings and additional training on the company's strict non-harassment Policy, Mr. Murray did not heed these warnings. On August 26, 2006, Mr. Murray attended a party at the home of a subordinate employee, Claudia Gallegos. (UF 12). While at the party, Mr. Murray admits that he had inappropriate contact with Sandra Rosales, also a subordinate. (UF 12). When Ms. Rosales reported the incident to HOST, human resources personnel conducted a thorough investigation. (UF 9-13.) They gathered more than enough evidence, including Mr. Murray's own admission and a witness statement from Ms. Gallegos, to determine that Mr. Murray had indeed violated the Policy. (UF 12.) Mr. Murray's violation of this Policy overwhelmingly demonstrates that Mr. Murray was not meeting HOST's standards for its general managers and that his discharge was not only warranted, but necessary under the circumstances.

2. Mr. Murray Cannot Show That His Replacement Was Substantially Younger And Had Inferior Qualifications

Mr. Murray has also failed to show that his successor, Joe Niknam, is substantially younger or less qualified. In fact, Mr. Niknam is only four years younger than Mr. Murray and is himself in the



Exh 16

him, so between Darryl and Darin, and Darin made a formal complaint to Human Resources.

Q. So there were -- make sure I got this.

There were two events. One where alleged inappropriate comments were made and kissing; is that correct?

A. Correct.

Q. Those two events were combined into one event.

Is that fair say?

A. Yes, it was. It occurred at the same time.

Q. And when did that occur?

A. August 26th, I believe, is the correct date.

Q. Of what year?

A. 2006.

Q. And then you mentioned an alleged verbal altercation between Darin Chadwick and Darryl Murray?

A. That's correct.

Q. Did that happen before or after the alleged comments and kissing?

A. It happened after as a result of.

Q. When did that occur?

A. August 28th of 2006.

Q. How did it first come to your attention that there were allegations of inappropriate comments and

Exh 17

kissing that occurred on August 26th, 2006?

A. I received an email from my human resources specialist, Jennifer Nann, N-a-n-n. She sent it to my --

MS. RASKIN: Sorry. Do you want to tell him what her last name was at the time?

THE WITNESS: She got married since. Her name at the time was Bagayan, B-a-g-a-y-a-n, and it is now Nann. I received an email on my -- well, my work email. It was sent to my work email and copied on my home email on September 1st, and I was on vacation that day.

BY MR. TAPPE:

Q. And who sent this email?

A. Jennifer Bagayan/Jennifer Nann.

Q. And what information was -- it is hearsay, but what information was given to you in that email?

A. That Darin had come forward to Jennifer and indicated that there was an inappropriate situation between Darryl and Sandra, and that Darryl had kissed Sandra at an off-site party of Claudia Gallegos. And that Darryl had taken Darin into the cooler, I guess, a refrigerator, and told him that he was going to physically assault him.

"Kick his ass" is the quote and told him

that he needed to stop talking about him. Darryl told Darin that he needed to stop talking about him.

Q. So Jennifer Nann, used to be Bagayan, was informed by Darin Chadwick of both incidents, one on August 26 and the one on August 28, 2006; is that correct?

A. Yes, that's correct.

Q. And who is the person who was kissed on August 26, 2006, the subject in that incident?

A. Sandra Rosales.

Q. After -- strike that.

Did anyone else receive this email from Jennifer Nann, the one on September 1st, 2006, besides yourself?

A. No.

Q. What did you do when you received that email?

A. I told Jennifer that I would handle it when I got back to the office, that I didn't know what the situation was. It was a holiday weekend. I just told her that I would handle it, to keep it confidential. It was a, you know, confidential situation, and that I would handle it when I got back to the office.

Q. And then what did you do next?

A. When I got back to the office, I went to

Darryl. I asked him -- I informed him that there had been a complaint made. I wanted him to tell me what happened. He told me that there was nothing that happened. He explained to me that Sandra had been contacting him, stating that Darin was abusing her.

Darryl asked, "Was it physical?" Sandra said, "No." And I said, "Okay. Darin is saying that you kissed Sandra. Did this occur?" He said, "No." And I said, "Okay. I need to get your statement. Please send me your statement about this incident," in which he did. He sent me an email statement.

I talked to Darin. I asked Darin, you know, exactly what happened. "Please tell me the situation that you" --

Q. Let me slow you down. I don't mean to interrupt.

A. That's okay.

Q. I want to stick with the question and answer format a little bit.

A. Sure.

Q. When you first confronted Darryl Murray, approximately what date was that?

A. That would have been Tuesday, which would have been, I think, September 5th. Monday was the holiday, was the Labor Day holiday.

Q. Now, at the time you confronted Darryl Murray on approximately Tuesday, September 5th, at the time he was one of your three direct supervisors, correct?
A. Correct.
Q. Did you have any trepidation about confronting one of your supervisors about alleged misconduct that they had perpetrated?
A. No.
Q. It didn't make you uncomfortable to the point that you would want a more senior HR person to confront him?
A. Not at that time.
Q. And approximately what date did Darryl Murray send his email statement?
A. That same day.
Q. Same day.
And then what happened next?
A. After he sent the statement?
Q. Correct.
A. He sent the statement. I read it, spoke to Darin and then asked Darin what was the situation.
Q. And when did you speak with Darin Chadwick?
A. I can't recall the exact date. I believe it was the same day that I talked to Darryl.

Q. September 5th?
A. I believe so.
Q. And what did Darin Chadwick tell you when you talked to him on approximately September 5th?
A. He reiterated what was in the email from Jennifer Bagayan. He explained the same situation that he explained to her. She said she felt uncomfortable working there. He told me that Darryl had removed him from his position and basically reconfirmed everything that he told to Jennifer Bagayan.
Q. When you had this conversation with Darin Chadwick, did he say why he felt -- well, you said "uncomfortable working there."
Where is "there"? Where was Darin Chadwick assigned to work?
A. At the San Diego Airport. He felt uncomfortable working with Darryl at the airport.
Q. Did he say why?
A. Because he felt that Darin -- I'm sorry. I get the two confused. That Darryl had made a move, quote/unquote, on his girlfriend. And that he believed that he was demoted from an acting store manager to an assistant manager. And he felt that -- he felt uncomfortable in that situation.

Q. Darin Chadwick made allegations that Darryl Murray made moves on his girlfriend --

A. Sandra Rosales.

Q. Did he give any facts to substantiate this belief?

A. Facts? I am sorry. Could you be more clear.

Q. Facts that led him to believe that Darryl Murray was making moves on his girlfriend, Sandra Rosales.

Why did he believe that?

A. Okay. I understand. He stated that he attended a party in honor of Claudia Gallegos, he meaning Darryl, and that Darin had attended the same party. And Sandra had attended the same party. Sandra and Darin went together as a couple.

And Darin alleged that Darryl kissed Sandra in front of him at this party. He said he felt uncomfortable because, quote/unquote, as a man, he should have been able to protect his girlfriend from Darryl. He stated that since Darryl was his boss, he felt that he couldn't handle that situation as he normally would.

And I asked him, "What is normal?" And he said "in the streets," basically meaning physical

violence towards Darryl. But because they had a working relationship, he didn't want to do that. And he said he just felt uncomfortable working there.

Q. So Darin described to you that he felt like physical violence was appropriate but for the working relationship?

A. He didn't state it in that term, that I wanted to be physically violent. He used the terminology "in the streets," where basically "I would take care of this guy." And I don't know what that means to him. I mean, I am inferring that he meant beat him up.

Q. So basically based on your conversation with Darin Chadwick and you being there and, you know, reading the body language, hearing the whole context, it is your belief that Darin Chadwick was referring to beating up Darryl Murray when he said something about "take it to the streets"?

A. That's correct.

Q. Now, you mentioned, during this conversation you had with Darin Chadwick on approximately September 5, that Darin Chadwick lamented that he could not protect Sandra Rosales properly.

Is that fair to say?

A. That's fair.

## I.
## INTRODUCTION

In this case, Darryl Murray claims that he was terminated from his position as a general manager by HOST in violation of a contract that he believes existed, in violation of public policy, and in violation of the Fair Employment and Housing Act ("FEHA"), a statutory provision that prohibits age discrimination. In fact, Mr. Murray was fired for violation of HOST's Non-Harassment Policy and Policy Against Sexual Harassment (collectively referred to as the "Policy"). The person who replaced Mr. Murray was amply qualified and only four years younger than Mr. Murray. Mr. Murray also admits that the only written document he has with HOST expressly provides that his employment is at-will.

Debra Murray claims that she lost the services of Mr. Murray as a husband and provider as a result of his termination. Ms. Murray's cause of action, however, fails as a matter of law because her claim is based only on an injury to Mr. Murray, and Mr. Murray cannot sustain any of his claims. HOST is entitled to summary judgment on each of Plaintiffs' causes of action because the undisputed facts show that the Plaintiffs' claims are unsupported.

## II.
## STATEMENT OF FACTS

HOST is a company that prides itself on fair treatment of all employees and has a zero tolerance policy regarding clams of sexual harassment. Any allegations made against an employee, whether he or she is a manager or an hourly employee, are investigated by human resources professionals. In this case, that process was followed, and based on the results of the investigation, a determination was made that Mr. Murray had violated HOST's Policy. Consequently, on September 21, 2006, Mr. Murray's employment with HOST was terminated. (Statement of Uncontroverted Material Facts ("UF") 1.)

Exh 18

satisfactory matter and that he was replaced by a substantially younger person who had inferior qualifications.

1. Mr. Murray Has Failed To Show That He Was Performing His Job In A Satisfactory Manner

Every HOST employee is required to abide by HOST's Policy. As a manager, Mr. Murray was especially aware of this Policy because it was part of his responsibilities to enforce it. (UF 19.) Additionally, Mr. Murray received supplemental training on the Policy's application on two previous occasions when he had been accused of sexual harassment by his subordinates. (UF 4-8.) As recently as March 3, 2005, Mr. Murray acknowledged his awareness of and commitment to the Policy when he signed an Associate Acknowledgement of Non-Harassment Policy and Policy Against Sexual Harassment. (Pl's Dep., Ex. 7.)

Despite receiving warnings and additional training on the company's strict non-harassment Policy, Mr. Murray did not heed these warnings. On August 26, 2006, Mr. Murray attended a party at the home of a subordinate employee, Claudia Gallegos. (UF 12). While at the party, Mr. Murray admits that he had inappropriate contact with Sandra Rosales, also a subordinate. (UF 12). When Ms. Rosales reported the incident to HOST, human resources personnel conducted a thorough investigation. (UF 9-13.) They gathered more than enough evidence, including Mr. Murray's own admission and a witness statement from Ms. Gallegos, to determine that Mr. Murray had indeed violated the Policy. (UF 12.) Mr. Murray's violation of this Policy overwhelmingly demonstrates that Mr. Murray was not meeting HOST's standards for its general managers and that his discharge was not only warranted, but necessary under the circumstances.

2. Mr. Murray Cannot Show That His Replacement Was Substantially Younger And Had Inferior Qualifications

Mr. Murray has also failed to show that his successor, Joe Niknam, is substantially younger or less qualified. In fact, Mr. Niknam is only four years younger than Mr. Murr

Exh 19

Case 3:07-cv-02056-H-BLM Document 21-4 Filed 08/22/2008 Page 3 of 5

10. Idalia Castro, who at the time was HOST's Senior Field Human Resources Manager, and Thomas Stein, HOST's Director of Loss Prevention, conducted interviews with various witnesses regarding Ms. Rosales' allegations. (Castro Decl. ¶¶ 4-6; Declaration of Thomas Stein ¶ 3, attached (August 20, 2008).)

11. On September 6, 2006, Ms. Castro met with Ms. Rosales. During this meeting, Ms. Rosales told Ms. Castro that Mr. Murray had kissed her at the party and that "she had pushed him away hoping her boyfriend didn't see." (Castro Decl. ¶ 5; Ex. B to Castro Decl.)

12. On September 19, 2006, Mr. Stein met with Mr. Murray to discuss Ms. Rosales' allegations. During the meeting, Mr. Murray confirmed that he attended the party and admitted to kissing Ms. Rosales. (Stein Decl. ¶ 3; Ex. A to Stein Decl.; Ex. 10 to Pl's Dep.)

13. Claudia Gallegos confirmed to Ms. Castro in a written statement that at her party she saw that Mr. Murray "gave [Ms. Rosales] a kiss on the lips" and that the kiss was "lingering." (Ex. C to Castro Decl.)

14. During his deposition, on March 25, 2008, Mr. Murray admitted to kissing Sandra Rosales at the party of Claudia Gallegos. (Pl's Dep. 56:22-58:01.)

15. Joe Niknam took over as the general manager at the San Diego International Airport on October 19, 2006. (Declaration of Joe Niknam ¶ 1, attached hereto Exhibit 4 (June 30, 2008).)

16. Mr. Niknam is 48 years old. (Nikam Decl. ¶ 2.)

17. At the time he filed his complaint, Mr. Murray was 52 years old. (Pl's Compl.¶¶ 9-10.)

18. Prior to taking over as the general manager at the San Diego International Airport, Mr. Niknam had worked at HOST for 16 years during which time he served as the general manager at two other airports and a shopping plaza. (Niknam Decl. ¶ 3.)

Exh 20

**DECLARATION OF JOE NIKNAM**

**I, Joe Niknam, declare as follows:**

I have personal knowledge of the facts contained in this declaration, and if called as a witness, I could and would testify as to their accuracy:

1. Since October 19, 2006, I have worked as the General Manager of Food and Beverage at the San Diego International Airport.

2. I am 49 years old. At the time I took over as the General Manager I was 47 years old.

3. Prior to taking over as the general manager at the San Diego International Airport, I had worked at HOST for 16 years during which time I served as the general manager at two other locations (John Wayne Airports and Ontario Mills Mall).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of June, 2008, at San Diego, California.

Joe Niknam

Exh 21

10. Idalia Castro, who at the time was HOST's Senior Field Human Resources Manager, and Thomas Stein, HOST's Director of Loss Prevention, conducted interviews with various witnesses regarding Ms. Rosales' allegations. (Castro Decl. ¶¶ 4-6; Declaration of Thomas Stein ¶ 3, attached (August 20, 2008).)

11. On September 6, 2006, Ms. Castro met with Ms. Rosales. During this meeting, Ms. Rosales told Ms. Castro that Mr. Murray had kissed her at the party and that "she had pushed him away hoping her boyfriend didn't see." (Castro Decl. ¶ 5; Ex. B to Castro Decl.)

12. On September 19, 2006, Mr. Stein met with Mr. Murray to discuss Ms. Rosales' allegations. During the meeting, Mr. Murray confirmed that he attended the party and admitted to kissing Ms. Rosales. (Stein Decl. ¶ 3; Ex. A to Stein Decl.; Ex. 10 to Pl's Dep.)

13. Claudia Gallegos confirmed to Ms. Castro in a written statement that at her party she saw that Mr. Murray "gave [Ms. Rosales] a kiss on the lips" and that the kiss was "lingering." (Ex. C to Castro Decl.)

14. During his deposition, on March 25, 2008, Mr. Murray admitted to kissing Sandra Rosales at the party of Claudia Gallegos. (Pl's Dep. 56:22-58:01.)

15. Joe Niknam took over as the general manager at the San Diego International Airport on October 19, 2006. (Declaration of Joe Niknam ¶ 1, attached hereto Exhibit 4 (June 30, 2008).)

16. Mr. Niknam is 48 years old. (Nikam Decl. ¶ 2.)

17. At the time he filed his complaint, Mr. Murray was 52 years old. (Pl's Compl.¶¶ 9-10.)

18. Prior to taking over as the general manager at the San Diego International Airport, Mr. Niknam had worked at HOST for 16 years during which time he served as the general manager at two other airports and a shopping plaza. (Niknam Decl. ¶ 3.)

Exh 22

David D. Miller (State Bar No. 66863)
Nicholas S. King (State Bar No. 179605)
Patricia I. James (State Bar No. 90633)
MILLER, KING & JAMES, LLP
ATTORNEYS AT LAW
707 Broadway, Suite 1800
San Diego, CA 92101-5314
Telephone: 619.685.0077
Facsimile: 619.685.0011

Attorneys for: Plaintiffs

FILED
Clerk of the Superior Court
AUG 29 2007
By: T. CURRY, Deputy

37-2007-00074036-CU-WT-CTL

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

DARRYL MURRAY and DEBRA MURRAY,

Plaintiffs,

v.

HMSHOST CORPORATION, HMS HOST FAMILY RESTAURANTS, INC., HMS HOST USA, INC., and DOES 1-100, Inclusive.

Defendants.

Case No.:

COMPLAINT FOR VIOLATION OF FAIR EMPLOYMENT AND HOUSING ACT; WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY; BREACH OF CONTRACT; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND LOSS OF CONSORTIUM

Plaintiffs DARRYL MURRAY (hereinafter referred to as "DARRYL") and DEBRA MURRAY (hereinafter referred to as "DEBRA") allege:

**GENERAL ALLEGATIONS**

1. Plaintiffs, were, at all times herein mentioned, residents of the County of San Diego, State of California.

2. Plaintiffs are informed and believe and thereon allege that defendants HMSHOST CORPORATION, HMS HOST FAMILY RESTAURANTS, INC., and HMS HOST USA, INC., (hereinafter collectively referred to as "HOST") are, and at all times herein mentioned were,

Exh 23

corporations operating, and doing business and located in the County of San Diego, State of California.

3. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

4. Plaintiffs are informed and believe and thereon allege that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiffs' damages as herein alleged were proximately caused by their conduct.

5. Plaintiffs are informed and believe and thereon allege that each of the defendants named herein was, at all times herein mentioned, the agent and employee of the remaining defendants and, in doing the things hereinafter alleged, each was acting within the course and scope of said agency and employment.

**FIRST CAUSE OF ACTION**

(Violation of Fair Employment and Housing Act - Employment Discrimination by DARRYL)

6. DARRYL hereby realleges and incorporates herein by this reference paragraphs 1 through 5 of the General Allegations.

7. HOST are entities subject to suit under the California Fair Employment and Housing Act, Government Code §12900 et seq. (hereinafter referred to as the "FEHA"), in that HOST are employers who regularly employ five or more persons.

8. The unlawful employment practice complained of herein occurred in San Diego County.

9. On December 18, 1988, DARRYL was hired by HOST in the capacity of "Operations Manager." On September 21, 2006, HOST terminated DARRYL's employment. At the time of termination, DARRYL's ending title was General Manager.

10. DARRYL was 52 years old at the time of his termination

protected age group. (UF 16). At the time that Mr. Niknam took over as general manager at the San Diego International Airport, he had been employed with HOST in a managerial position for over 16 years. (UF 18.) Moreover, Mr. Niknam has successfully held positions as general manager at two other airports, as well as a shopping mall. (UF 18.) Mr. Murray has no evidence, and cannot prove that Mr. Niknam lacked the qualifications to replace him as the general manager.

Since Mr. Murray lacks evidence demonstrating that his replacement was substantially younger and had inferior qualifications, he cannot make out a *prima facie* case of age discrimination and summary judgment is appropriate on this cause of action.

B. HOST's Reasons For Terminating Mr. Murray's Employment Are Legitimate And Non-Discriminatory

Assuming, *arguendo*, that Mr. Murray can establish a *prima facie* case of age discrimination, the burden shifts to HOST to articulate a legitimate, non-discriminatory reason for terminating his employment. The actual burden of proving that defendants intentionally discriminated against plaintiff remains with plaintiff at all times. *Board of Trustees of Keene State College et al. v. Sweeney*, 439 U.S. 24, 29 (1978)(explaining that "it is only the burden of producing evidence of legitimate nondiscriminatory reasons which shifts to the employer; the burden of persuasion, as the Court of Appeals properly recognized, remains with the plaintiff.").

HOST has more than articulated its legitimate reason to terminate Mr. Murray. As stated above, HOST had a duty both based on its own internal policies and based on federal and state laws, to investigate all complaints of sexual harassment. When Ms. Rosales filed her complaint against Mr. Murray, HOST commenced an investigation into the allegations. (UF 9-13.) Upon substantiating Ms. Rosales' claims with witness statements and even by Mr. Murray's own admission, HOST had no choice but to terminate his employment. HOST has more than met its showing that it had a legitimate reason to terminate Mr. Murray's employment, therefore the burden shifts to Mr. Murray to show otherwise.

Exh 24

kissing that occurred on August 26th, 2006?

A. I received an email from my human resources specialist, Jennifer Nann, N-a-n-n. She sent it to my --

MS. RASKIN: Sorry. Do you want to tell him what her last name was at the time?

THE WITNESS: She got married since. Her name at the time was Bagayan, B-a-g-a-y-a-n, and it is now Nann. I received an email on my -- well, my work email. It was sent to my work email and copied on my home email on September 1st, and I was on vacation that day.

BY MR. TAPPE:

Q. And who sent this email?

A. Jennifer Bagayan/Jennifer Nann.

Q. And what information was -- it is hearsay, but what information was given to you in that email?

A. That Darin had come forward to Jennifer and indicated that there was an inappropriate situation between Darryl and Sandra, and that Darryl had kissed Sandra at an off-site party of Claudia Gallegos. And that Darryl had taken Darin into the cooler, I guess, a refrigerator, and told him that he was going to physically assault him.

"Kick his ass" is the quote and told him

Exh 25

CERTIFIED COPY

# THORSNES LITIGATION SERVICES

## Transcript of the Testimony of:

# Sandra Rosales

**Date:** July 16, 2008

**Volume:** I

**Case:** Murray v. HMS Host

Exh 26

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney of party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: July 21, 2008

Monica M. Frank

MONICA M. FRANK
CSR NO. 13320

Q. And who did he tell you he was going to make the complaint to?
A. Jennifer Lakin.
Q. And what did he tell you he was going to say to Jennifer Lakin when he made his complaint?
A. What had happened, I think.
Q. Did he go over the story with you again, what he was going to tell Jennifer Lakin?
A. No. He didn't want to talk about that.
Q. And what was your response when Darin Chadwick told you that he was going to make a complaint to Jennifer Lakin about Darryl Murray?
A. Nothing. What could I say?
Q. You could have said anything you wanted. What did you say?
A. I said, "If they were going to call me, that would be fine."
Q. Did you tell Darin Chadwick you thought it was a good idea for him to make the complaint?
A. No, I didn't say that.
Q. Did you tell him you thought it was a bad idea to make that complaint?
A. I told him to do what he thought was right.
Q. Did Darin Chadwick ever show you a copy of the statement he made to Jennifer Lakin?

at the time. But now that we talked about the calendar, you change your mind. You are telling me he was not living with you at the time he left Trophy's, correct?

A. No. We left each other in August, and he left -- he left that job in October.

Q. Oh, so he left the job during that time, between August of '07 and December of '07, when you were separated?

A. That's what he said to me.

Q. And then he left that job before he came back to your house in December of '07, correct?

A. Yes. Because when he came back, he wasn't working there.

THE INTERPRETER: I am sorry. The interpreter made a mistake.

THE WITNESS: He wasn't working at all.

BY MR. TAPPE:

Q. So between December of '07 and 25 February of 2008, two to three months, Darin Chadwick was not working at all?

A. No.

Q. Did he have money to live on?

A. Not that I know of.

Q. Was he looking for a job?

Exh 27

BY MR. TAPPE:
Q. Is that not true?
A. Only he knows.
Q. Well, before this kiss on August 26th, 2006, did Darryl Murray ever do anything to you that made you think he was trying to establish a romantic relationship with you?
A. No.
Q. Did he ever ask you on a date?
A. No.
Q. A date of any kind? I won't get graphic.
A. No.
Q. He didn't ask you for anything?
MS. RASKIN: Objection. Asked and answered.
BY MR. TAPPE:
Q. How about after this kiss occurred?
A. No.
Q. Even when you are having a private conversation in the training room?
A. Never.
Q. Do you remember Darryl Murray ever saying anything inappropriate to you?
A. Perhaps once.
Q. And what was the inappropriate thing that you recall Darryl Murray saying to you?

C. Mr. Murray Cannot Show That HOST's Reason For His Discharge Was False Or A Pretext

Since HOST has articulated a legitimate, non-discriminatory reason for terminating Mr. Murray's employment, he now bears the ultimate burden to produce "specific and significantly probative evidence" that HOST's stated reason was nothing more than a pretext. *See Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986) (affirming summary judgment for the employer).

The only specific evidence Mr. Murray points to of HOST's alleged discrimination was that he had been with HOST a long time and was receiving a high salary. (UF 20). Mr. Murray admits, however, that only a few months before his termination, the President of HOST, Mr. Elie Maalouf, offered him a promotion and raise, which he turned down because he did not wish to relocate. (UF 21.) This admission by Mr. Murray alone shows that HOST had no intention of terminating his employment simply because of his length of service or salary. A company that was looking to discriminate against an employee on the basis of his age would not offer that same employee a promotion, raise and opportunity for further career advancement just months before terminating his employment.

Moreover, the employee that replaced Mr. Murray, Joe Niknam, is only 4 years younger than Mr. Murray and also protected by the Fair Employment and Housing Act ("FEHA") because he is over 40. (UF 16.) Furthermore, Mr. Niknam was also highly paid and had been employed with HOST for over 16 years. (UF 18.) Indeed, nothing about Mr. Murray's termination suggests anything other than that HOST acted in absolute conformance with HOST's Policy and terminated Mr. Murray for sexual harassment, not based on age. Since Mr. Murray cannot, and has not, produced specific substantial evidence showing that HOST's stated reason for his discharge is pretextual, HOST is entitled to summary judgment as to Mr. Murray's age discrimination claim.

Exh 28

**CERTIFIED COPY**

# THORSNES LITIGATION SERVICES

Transcript of the Testimony of:

## Elie W. Maalouf

**Date:** July 25, 2008

**Volume:** I

**Case:** Murray v. HMS Host

Exh 29

THORSNES LITIGATION SERVICES, LLC
2550 FIFTH AVENUE, NINTH FLOOR
SAN DIEGO, CALIFORNIA 92103
(P): 619.233.2030
(F): 619.330.1956
E-MAIL: INFO@THORSNES.COM
WEB: WWW.THORSNES.COM

REPORTER'S CERTIFICATE

I, Mirosalva Olguin, Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was taken by me in machine shorthand and later transcribed into typewriting, under my direction; and that the foregoing contains a true record of the testimony of the witness.

Date: This 6th day of August, 2008, at San Diego, California.

Mirosalva Olguin
MIROSALVA OLGUIN
CSR No. 12959

limited. So maybe you remember nothing or hardly at all. That's why I asked the question that way.
Do you remember anything about him?
A It could help if you're more precise.
Q Okay. So I will be.
Do you remember any conversation you had with Darryl Murray?
A I recall having social conversations with him like I do with many other managers at management gatherings. But there was no, let's say, formal means by which we communicated. Because I don't have that formal means with any of our general managers. I communicate through their supervisors.
Q Okay. Do you recall anything distinctive about any of your meetings with Darryl Murray or not?
A I would not use the word "distinctive." I know who he is. I recall his appearance. I walked the operation with him once in San Diego. But I don't know what you mean by "distinctive."
Q Okay. By -- when did you -- best estimate, when did you walk the operation with Darryl Murray in San Diego?
A Three to four years ago.
Q Okay.
A It could be even more.

satisfactory matter and that he was replaced by a substantially younger person who had inferior qualifications.

1. Mr. Murray Has Failed To Show That He Was Performing His Job In A Satisfactory Manner

Every HOST employee is required to abide by HOST's Policy. As a manager, Mr. Murray was especially aware of this Policy because it was part of his responsibilities to enforce it. (UF 19.) Additionally, Mr. Murray received supplemental training on the Policy's application on two previous occasions when he had been accused of sexual harassment by his subordinates. (UF 4-8.) As recently as March 3, 2005, Mr. Murray acknowledged his awareness of and commitment to the Policy when he signed an Associate Acknowledgement of Non-Harassment Policy and Policy Against Sexual Harassment. (Pl's Dep., Ex. 7.)

Despite receiving warnings and additional training on the company's strict non-harassment Policy, Mr. Murray did not heed these warnings. On August 26, 2006, Mr. Murray attended a party at the home of a subordinate employee, Claudia Gallegos. (UF 12). While at the party, Mr. Murray admits that he had inappropriate contact with Sandra Rosales, also a subordinate. (UF 12). When Ms. Rosales reported the incident to HOST, human resources personnel conducted a thorough investigation. (UF 9-13.) They gathered more than enough evidence, including Mr. Murray's own admission and a witness statement from Ms. Gallegos, to determine that Mr. Murray had indeed violated the Policy. (UF 12.) Mr. Murray's violation of this Policy overwhelmingly demonstrates that Mr. Murray was not meeting HOST's standards for its general managers and that his discharge was not only warranted, but necessary under the circumstances.

2. Mr. Murray Cannot Show That His Replacement Was Substantially Younger And Had Inferior Qualifications

Mr. Murray has also failed to show that his successor, Joe Niknam, is substantially younger or less qualified. In fact, Mr. Niknam is only four years younger than Mr. Murray and is himself in the



Exh 30

Case 3:07-cv-02056-H-BLM Document 21 Filed 08/22/2008 Page 12 of 20

protected age group. (UF 16). At the time that Mr. Niknam took over as general manager at the San Diego International Airport, he had been employed with HOST in a managerial position for over 16 years. (UF 18.) Moreover, Mr. Niknam has successfully held positions as general manager at two other airports, as well as a shopping mall. (UF 18.) Mr. Murray has no evidence, and cannot prove that Mr. Niknam lacked the qualifications to replace him as the general manager.

Since Mr. Murray lacks evidence demonstrating that his replacement was substantially younger and had inferior qualifications, he cannot make out a *prima facie* case of age discrimination and summary judgment is appropriate on this cause of action.

B. HOST's Reasons For Terminating Mr. Murray's Employment Are Legitimate And Non-Discriminatory

Assuming, *arguendo*, that Mr. Murray can establish a *prima facie* case of age discrimination, the burden shifts to HOST to articulate a legitimate, non-discriminatory reason for terminating his employment. The actual burden of proving that defendants intentionally discriminated against plaintiff remains with plaintiff at all times. *Board of Trustees of Keene State College et al. v. Sweeney*, 439 U.S. 24, 29 (1978)(explaining that "it is only the burden of producing evidence of legitimate nondiscriminatory reasons which shifts to the employer; the burden of persuasion, as the Court of Appeals properly recognized, remains with the plaintiff.").

HOST has more than articulated its legitimate reason to terminate Mr. Murray. As stated above, HOST had a duty both based on its own internal policies and based on federal and state laws, to investigate all complaints of sexual harassment. When Ms. Rosales filed her complaint against Mr. Murray, HOST commenced an investigation into the allegations. (UF 9-13.) Upon substantiating Ms. Rosales' claims with witness statements and even by Mr. Murray's own admission, HOST had no choice but to terminate his employment. HOST has more than met its showing that it had a legitimate reason to terminate Mr. Murray's employment, therefore the burden shifts to Mr. Murray to show otherwise.

C. Mr. Murray Cannot Show That HOST's Reason For His Discharge Was False Or A Pretext

Since HOST has articulated a legitimate, non-discriminatory reason for terminating Mr. Murray's employment, he now bears the ultimate burden to produce "specific and significantly probative evidence" that HOST's stated reason was nothing more than a pretext. *See Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986) (affirming summary judgment for the employer).

The only specific evidence Mr. Murray points to of HOST's alleged discrimination was that he had been with HOST a long time and was receiving a high salary. (UF 20). Mr. Murray admits, however, that only a few months before his termination, the President of HOST, Mr. Elie Maalouf, offered him a promotion and raise, which he turned down because he did not wish to relocate. (UF 21.) This admission by Mr. Murray alone shows that HOST had no intention of terminating his employment simply because of his length of service or salary. A company that was looking to discriminate against an employee on the basis of his age would not offer that same employee a promotion, raise and opportunity for further career advancement just months before terminating his employment.

Moreover, the employee that replaced Mr. Murray, Joe Niknam, is only 4 years younger than Mr. Murray and also protected by the Fair Employment and Housing Act ("FEHA") because he is over 40. (UF 16.) Furthermore, Mr. Niknam was also highly paid and had been employed with HOST for over 16 years. (UF 18.) Indeed, nothing about Mr. Murray's termination suggests anything other than that HOST acted in absolute conformance with HOST's Policy and terminated Mr. Murray for sexual harassment, not based on age. Since Mr. Murray cannot, and has not, produced specific substantial evidence showing that HOST's stated reason for his discharge is pretextual, HOST is entitled to summary judgment as to Mr. Murray's age discrimination claim.

Exh 31

been -- I am thinking because we had two general managers interviewed. It was Joe Niknam. It was Fitsy (phonetic), Fitzpatrick, Kieran Fitzpatrick. Those are the two.

Q. Kieran or Karen?

A. Kieran.

Q. Female?

A. Male.

Q. K-i-r-i-n?

A. K-i-e-r-a-n.

Q. What were the ages of Joe Niknam and Kieran Fitzpatrick during this selection process?

A. Don't know.

Q. Best estimate?

A. Joe Niknam is probably in his 50s, and Kieran Fitzpatrick is in his 30s.

Q. Where was Joe Niknam assigned prior to coming to San Diego?

A. John Wayne Airport.

Q. Where was Kieran Fitzpatrick assigned at the time he applied for the San Diego job?

A. Phoenix Airport.

Q. So Joe Niknam left John Wayne to come to San Diego eventually, correct?

A. That's correct.

Exh 32

Q. Who replaced him at John Wayne?
A. Carlos Barranetes.
Q. Who selected Carlos Barranetes?
A. I think it was about the same team, the regional team.
Q. Who else interviewed for the John Wayne job with the same group that Carlos Barranetes -- let me rephrase that, make it a proper question.
Who all interviewed for the John Wayne general manager job that Carlos Barranetes eventually got?
A. Who did the interview, or who interviewed?
Q. Who interviewed? Who were the other interviewees?
A. Kieran Fitzpatrick was one of them. Patrick was one of them. I think it is Ted or Tim Fox from the north. It was one of our female general managers. I can't remember her name. About three people, I can't remember their names.
Q. Approximate ages of these people, Carlos Barranetes?
A. Late 30s, early 40s.
Q. Mr. Fox?
A. Late 30s, early 40s.
Q. And the female GM?

## V.
## MR. MURRAY'S CLAIM FOR VIOLATION OF PUBLIC POLICY FAILS AS A MATTER OF LAW

Under California law, in order to establish the existence of a violation of a fundamental public policy in the context of a wrongful discharge action, the asserted public policy must have a basis in either constitutional or statutory provisions. While the California Constitution expresses a fundamental public policy against race and sex discrimination, the California Supreme Court recently determined that there is "no law of this state other than the FEHA which proscribes discrimination on the basis of age." *Jennings v. Marralle*, 8 Cal. 4th 121, 132 (1994)(distinguished on other grounds by *Stevenson v. Superior Ct.*, 16 Cal. 4th 880 (1997)). As described above, summary judgment is proper on Mr. Murray's wrongful discharge claim because Mr. Murray has not established that HOST's conduct violated the FEHA.

## VI.
## MR. MURRAY'S CLAIM FOR BREACH OF AN IMPLIED CONTRACT FAILS AS A MATTER OF LAW

A. There Was Never Any Contract, Implied Or Explicit, Between Mr. Murray And HOST

Mr. Murray contends that an implied-in-fact contract existed that required HOST to have good cause before terminating his employment. In California, however, an employment relationship having no set term is presumed to be terminable at will. Cal. Lab. Code § 2922. A party may overcome the at-will presumption by proving with competent evidence that an implied contract to terminate only for good cause exists. *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1998). In analyzing whether an at-will presumption has been overcome, California courts consider the "totality of the circumstances" surrounding the employer-employee relationship, including: (1) the personnel policies and practices of the employer, (2) the employee's longevity of service; (3)

Exh 33

Case 3:07-cv-02056-H-BLM Document 21 Filed 08/22/2008 Page 14 of 20

## V.
## MR. MURRAY'S CLAIM FOR VIOLATION OF PUBLIC POLICY FAILS AS A MATTER OF LAW

Under California law, in order to establish the existence of a violation of a fundamental public policy in the context of a wrongful discharge action, the asserted public policy must have a basis in either constitutional or statutory provisions. While the California Constitution expresses a fundamental public policy against race and sex discrimination, the California Supreme Court recently determined that there is "no law of this state other than the FEHA which proscribes discrimination on the basis of age." *Jennings v. Marralle*, 8 Cal. 4th 121, 132 (1994)(distinguished on other grounds by *Stevenson v. Superior Ct.*, 16 Cal. 4th 880 (1997)). As described above, summary judgment is proper on Mr. Murray's wrongful discharge claim because Mr. Murray has not established that HOST's conduct violated the FEHA.

## VI.
## MR. MURRAY'S CLAIM FOR BREACH OF AN IMPLIED CONTRACT FAILS AS A MATTER OF LAW

A. <u>There Was Never Any Contract, Implied Or Explicit, Between Mr. Murray And HOST</u>

Mr. Murray contends that an implied-in-fact contract existed that required HOST to have good cause before terminating his employment. In California, however, an employment relationship having no set term is presumed to be terminable at will. Cal. Lab. Code § 2922. A party may overcome the at-will presumption by proving with competent evidence that an implied contract to terminate only for good cause exists. *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1998). In analyzing whether an at-will presumption has been overcome, California courts consider the "totality of the circumstances" surrounding the employer-employee relationship, including: (1) the personnel policies and practices of the employer, (2) the employee's longevity of service; (3)

Exh 34

Case 3:07-cv-02056-H-BLM Document 21 Filed 08/22/2008 Page 15 of 20

actions or communications by the employer reflecting assurances of continued employment; and (4) practices in the industry. *Id.* at 681.

Mr. Murray cannot overcome the at-will presumption of Cal. Lab. Code section 2922 because he has no evidence to show that the totality of the circumstances created an implied contract to terminate only with good cause. In fact, the totality of the circumstances demonstrates the existence of a clear policy of at-will employment. Two separate written offers of employment signed by Mr. Murray in December 1999 and May 2000, expressly provide that: "[these] letter[s are] *not a contract or guarantee of employment*." (UFs 22-23) (emphasis added). Mr. Murray also admits that: (1) no executive officer ever orally promised that HOST would only terminate him for good cause; and (2) no executive officer at HOST expressly told him that HOST would employ him for a specified period of time. (UF 24) Despite these admissions, Mr. Murray contends that an implied contract to terminate only for good cause existed because he received multiple promotions, positive annual reviews and oral praise of his work during his lengthy employment with HOST.

The evidence offered by Mr. Murray, however, is not enough, as a matter of law, to overcome the presumption of at-will employment: "Lengthy employment, promotions and positive reviews [] by themselves, do not create an implied contract to terminate only for good cause." *Kovatch v. California Casualty Management Co., Inc.*, 65 Cal. App. 4th 1256, 1276 (1998)(disapproved on other grounds)(positive performance reviews, commendations, salary increase and vague assurances are "natural occurrences of an employee who remains with an employer for a substantial length of time" and does not give rise to implied contract); *Miller v. Pepsi-Cola Bottling Co.*, 210 Cal. App. 3d 1554, 1559 (1989) (finding that 11 years of employment is insufficient to give rise to implied contract); *see Davis v. Consolidated Freightways*, 29 Cal. App. 4th 354, 366-69 (1994) (finding no implied contract for ten year employee and stating "[c]onspicuously absent from plaintiff's pleadings or evidence is

Exh 35

actions or communications by the employer reflecting assurances of continued employment; and (4) practices in the industry. *Id.* at 681.

Mr. Murray cannot overcome the at-will presumption of Cal. Lab. Code section 2922 because he has no evidence to show that the totality of the circumstances created an implied contract to terminate only with good cause. In fact, the totality of the circumstances demonstrates the existence of a clear policy of at-will employment. Two separate written offers of employment signed by Mr. Murray in December 1999 and May 2000, expressly provide that: "[these] letter[s are] *not a contract or guarantee of employment*." (UFs 22-23) (emphasis added). Mr. Murray also admits that: (1) no executive officer ever orally promised that HOST would only terminate him for good cause; and (2) no executive officer at HOST expressly told him that HOST would employ him for a specified period of time. (UF 24) Despite these admissions, Mr. Murray contends that an implied contract to terminate only for good cause existed because he received multiple promotions, positive annual reviews and oral praise of his work during his lengthy employment with HOST.

The evidence offered by Mr. Murray, however, is not enough, as a matter of law, to overcome the presumption of at-will employment: "Lengthy employment, promotions and positive reviews [] by themselves, do not create an implied contract to terminate only for good cause." *Kovatch v. California Casualty Management Co., Inc.*, 65 Cal. App. 4th 1256, 1276 (1998)(disapproved on other grounds)(positive performance reviews, commendations, salary increase and vague assurances are "natural occurrences of an employee who remains with an employer for a substantial length of time" and does not give rise to implied contract); *Miller v. Pepsi-Cola Bottling Co.*, 210 Cal. App. 3d 1554, 1559 (1989) (finding that 11 years of employment is insufficient to give rise to implied contract); *see Davis v. Consolidated Freightways*, 29 Cal. App. 4th 354, 366-69 (1994) (finding no implied contract for ten year employee and stating "[c]onspicuously absent from plaintiff's pleadings or evidence is

Exh 36

any hint that he was ever told at any time that he had permanent employment or that he would be retained as long as he was doing a good job").

Nothing presented by Mr. Murray demonstrates the existence of circumstances beyond what is expected as part of any normal long-term employment relationship. Moreover, HOST has presented ample evidence to show that Mr. Murray's employment was at-will. Accordingly, his claim for breach of an implied contract fails as a matter of law.

B. Even If Mr. Murray Can Establish That An Implied Contract Existed, HOST Still Had Good Cause For His Discharge

Even if, as Mr. Murray claims, there had been a contract that ensured that Mr. Murray would not be terminated other than for cause, HOST did not breach that contract. Mr. Murray's employment was terminated when he violated HOST's Policy. The law is clear that employers may terminate employees who engage in misconduct. *See Medina-Munoz v. R. J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990). Furthermore, employees may not seek protection for activities that violate company rules, knowingly disobeying orders, disrupting the work environment, or interfering with company goals. *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985).

In looking at the decision to terminate employment, courts will generally defer to the employer's good faith exercise of its managerial discretion. *See e.g., Cotran v. Hudig Hall Internat., Inc.*, 17 Cal.4th 93, 100-101 (1998) (" '[a]n employer must have wide latitude in making independent, good faith judgments ... without the threat of a jury second-guessing its business judgment . . .") (citing, *Pugh v. See's Candies, Inc.*, 203 Cal. App. 3d 743, 769 (1988)(italics in original). Additionally,"[c]are must be taken [by courts]... not to interfere with the legitimate exercise of managerial discretion.... And where ... the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." *Pugh v. See's Candies, Inc.*, 116 Cal. App. 3d 311, 330 (1981)(overruled on other grounds).

Exh 37

HOST followed its legitimate business practices in making the decision to terminate Mr. Murray. It conducted a thorough investigation of the allegations, a fact that Mr. Murray admitted in his deposition. In fact, when counsel for HOST asked Mr. Murray whether he could think of any additional witnesses with whom investigators should have spoken, Mr. Murray could not think of anyone. (UF 25.) Moreover, Ms. Murray, during her deposition similarly admitted that "two weeks prior to him being fired, [HOST was] doing extensive interviews with the whole staff . . ." (UF 26.) Based on the thorough investigation which substantiated the sexual harassment complaint against Mr. Murray, HOST determined that he violated HOST's Policy. The violation of this vital Policy constituted good cause for HOST's termination decision.

## VII.
## MR. MURRAY'S CLAIM FOR VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW

### A. Mr. Murray's Implied Covenant Claim Is Duplicative of His Claim For Breach Of Contract

Mr. Murray bases his claim for breach of implied covenant on the identical allegations as his contract claim, *i.e.*, that HOST allegedly failed to terminate him with good cause. It is well established that, in the employment context, the implied covenant of good faith and fair dealing imposes no greater and no different obligations on the parties than the contract itself. *See Foley*, 47 Cal.3d at 684 (the California Supreme Court unequivocally held that contractual remedies should remain the sole available relief for breaches of the implied covenant in the employment context); *Aragon-Haas v. Family Sec. Ins. Serv.*, 231 Cal. App. 3d 232, 282 Cal. Rptr. 233 (1991)(breach of contract and breach of the implied covenant damages are the same). As explained by the California Court of Appeals:

> If the allegations [of a breach of covenant claim] do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

HOST followed its legitimate business practices in making the decision to terminate Mr. Murray. It conducted a thorough investigation of the allegations, a fact that Mr. Murray admitted in his deposition. In fact, when counsel for HOST asked Mr. Murray whether he could think of any additional witnesses with whom investigators should have spoken, Mr. Murray could not think of anyone. (UF 25.) Moreover, Ms. Murray, during her deposition similarly admitted that "two weeks prior to him being fired, [HOST was] doing extensive interviews with the whole staff . . ." (UF 26.) Based on the thorough investigation which substantiated the sexual harassment complaint against Mr. Murray, HOST determined that he violated HOST's Policy. The violation of this vital Policy constituted good cause for HOST's termination decision.

## VII.
## MR. MURRAY'S CLAIM FOR VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW

### A. Mr. Murray's Implied Covenant Claim Is Duplicative of His Claim For Breach Of Contract

Mr. Murray bases his claim for breach of implied covenant on the identical allegations as his contract claim, *i.e.,* that HOST allegedly failed to terminate him with good cause. It is well established that, in the employment context, the implied covenant of good faith and fair dealing imposes no greater and no different obligations on the parties than the contract itself. *See Foley*, 47 Cal.3d at 684 (the California Supreme Court unequivocally held that contractual remedies should remain the sole available relief for breaches of the implied covenant in the employment context); *Aragon-Haas v. Family Sec. Ins. Serv.*, 231 Cal. App. 3d 232, 282 Cal. Rptr. 233 (1991)(breach of contract and breach of the implied covenant damages are the same). As explained by the California Court of Appeals:

Exh 38

> If the allegations [of a breach of covenant claim] do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

HEJMADI *v.* AMFAC, INC., 202 Cal.App.3d 525 (1988)

249 Cal.Rptr. 5

VIVEK HEJMADI, Plaintiff and Appellant, v. AMFAC, INC., et al., Defendants and Respondents.

Docket No. A035675.

Court of Appeal of California, First District, Division Two.

June 27, 1988.

Page 547 contracting parties vary depending upon the nature of the employment relationship. "Broadly stated, that [implied] covenant requires that neither party do anything which will deprive the other of the *benefits of the agreement.*" (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* **36 Cal.3d at p. 768**; italics added.) Justice Kaufman, paraphrasing *Gruenberg* v. *Aetna Ins. Co., supra,* comments: "the obligations imposed by the implied covenant . . . are not those set out in the terms of the contract itself, but rather are obligations imposed by law governing the manner in which the *contractual obligations* must be discharged —— fairly and in good faith. [Citation.] While the specific nature of the obligations imposed by the implied covenant . . . are *dependent upon the nature and purpose of the underlying contract and the legitimate expectations of the parties arising from the contract* [citations], those obligations are not the obligations that were consensually undertaken in the contractual provisions, and care must be taken in each case to determine whether the alleged breach is an obligation imposed by law and thus a tort [citation] or breach of an obligation consensually created by the parties in the terms of the contract and thus simply a breach of contract. . . ." (*Koehrer* v. *Superior Court, supra,* **181 Cal.App.3d at p. 1169**; italics added.) **(15c)** It is apparent that continuous employment is not a "benefit of the agreement" where the employment relationship is strictly at will. The "legitimate expectations" of employee and employer in an at-will employment relationship can be no more than the continuation of employment until one party or the other decides to terminate the relationship. When that decision is made, "`. . . the privilege [to terminate] is absolute, and the presence of ill will or improper motive will not destroy it.' [Citation.]" (*Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union, supra,*

Exh 39

69 Cal.2d 727, fn. 12.) Moreover, the privilege to terminate may be exercised "*without regard to* [*the*] *duration*" of the at-will employment relationship. (*Ibid.*) Simply stated, where the at-will employment relationship is terminated, the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance. **(20, 21a) (See fn.7.)** To hold otherwise, in our opinion, would constitute an unwarranted judicial intrusion upon the fundamental public policy of this state as expressed in Labor Code section **2922** and dramatically upset the reasonable expectations of the parties to an at-will agreement of employment.**[fn7]**

Page 549 discharge exist when the employer ". . . in addition to breaching the contract . . . seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists," (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 769), or where the obligor (employer) engages ". . . in bad faith action, extraneous to the contract, with the motive intentionally to frustrate the obligee's [employee's] enjoyment of contract rights. [Citations.]" (*Sawyer* v. *Bank of America* (1978) **83 Cal.App.3d 135**, **139** [**145 Cal.Rptr. 623**].) **(21b)** However, it must be emphasized that the sine qua non for application of the implied covenant in an employment termination case is the *employees reasonable expectation of benefit* from the agreement. Where the discharged employee has pleaded and proved a good cause limitation on the right to terminate, that expectation is directed to *continuing benefits* from the agreement. Where the employment is strictly at will, there may exist in certain employment relationships an expectation of a contractual benefit which is independent of continuing employment. **(14b)** Having determined that plaintiff's seventh cause of action pleads a contractual cause of action predicated upon an implied-in-fact promise not to discharge except for good cause, we must now consider the sufficiency of the allegations of the eighth cause of action to determine whether, under the standards established in *Seaman's* and *Sawyer,* a tort cause of action based upon the implied covenant has been stated by plaintiff. We conclude it has not. *Seaman's* observed: "Of course, `it is not a tort for a contractual obligor to dispute his liability under [a] contract' (*Sawyer* v. *Bank of America* (1978) **83 Cal.App.3d 135**, **139** [**145 Cal.Rptr. 623**]) if the dispute is honest and undertaken in good faith. [Citation.] Similarly, it is not a tort for one party to deny, in good faith, the existence of a binding contract." (*Seaman's*

*Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 770.) Nothing in the pleading before us suggests "stonewalling" by the defendants here, a posture which the *Seaman's* court criticized. (*Id.* at p. 770.) Plaintiff does not allege that defendants without probable cause deny the existence of the employment contract or that defendants assert in bad faith a pretextual reason for his discharge. Nor does plaintiff plead any action by defendants extraneous to the employment contract. Simply stated, no facts are alleged by plaintiff to suggest he could state a cause of action for breach of the implied covenant. The court did not abuse its discretion in sustaining the demurrer. However, we earlier stated that the sine qua non for application of the implied covenant in an employment termination case is the employee's

CANCELLIER v. FEDERATED DEPT. STORES, 672 F.2d 1312 (9th Cir. 1982)

PHILIP D. CANCELLIER, JOHN W. COSTELLO AND ZELMA SMITH RITTER,

PLAINTIFFS-APPELLANTS/CROSS-APPELLEES, v. FEDERATED DEPARTMENT STORES D/B/A

I. MAGNIN, DEFENDANT-APPELLEE/CROSS-APPELLANT.

Nos. 81-4154, 81-4165.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted December 16, 1981.

Decided March 30, 1982.

Page 1318 18] C. *Tort Damages for Breach of the Implied Covenant* 19] Breach of the implied covenant [20] I. Magnin contends that a claim for breach of the implied covenant under the circumstances here is contrary to California law. The contention is without merit. [21] California law recognizes an implied covenant of good faith and fair dealing in certain contracts that neither party will do anything to deprive the other of the benefit of the contract. *See. e.g., Gruenberg v. Aetna Insurance Co.,* **9 Cal.3d 566**, 578, 108 Cal.Rptr. 480, **510 P.2d 1032** (1973) (en banc); *Comunale v. Traders & General Insurance Co.,* **50 Cal.2d 654**, 658, **328 P.2d 198** (1958). California courts have recently applied the duty created by the implied covenant to the situation where the employee alleges no more than long service and the existence of personnel policies or oral representations showing an implied promise by the employer not to act arbitrarily in dealing with its employees. Such claims sound in both contract and tort and may give rise to emotional distress damages and punitive damages. *Pugh v. See's Candies, Inc.,* **116 Cal.App.3d 311**, 171 Cal.Rptr. 917 (1981); *Cleary v. American Air Lines,* **111 Cal.App.3d 443**, 168 Cal.Rptr. 722 (1980) (alternative holding). *See Tameny v. Atlantic Richfield Co.,* **27 Cal.3d 167**, 179 n. 12, 164 Cal.Rptr. 839, **610 P.2d 1330** (1980) (dicta). *Cf.* Note, *Defining Public Policy Torts in At-Will Dismissals,* 34 Stan.L.Rev. 153 (1981) (arguing against application of implied covenant to employment context). 22] *Preemption* [23] The ADEA does not preempt the award of tort damages on pendent state claims. *Kelly v. American Standard, Inc.,* **640 F.2d 974**, 983 (9th Cir. 1981) (upholding emotional distress damages under state age discrimination statute). The award

Exh 40

of tort damages on state claims here did not duplicate ADEA relief. Plaintiffs' ADEA claims were based on age discrimination in firing. Plaintiffs' contract and covenant claims were based on I. Magnin's obligation not to deal arbitrarily or unfairly in terminating plaintiffs' employment, an obligation created by I. Magnin's personnel policies and the fact of long service by the employee.**[fn6]** Punitive and emotional distress damages for this violation, unavailable under the ADEA,**[fn7]** do not duplicate the ADEA award for back pay, lost benefits, and liquidated damages. While the wisdom of allowing open-ended state claims for breach of the implied covenant to coexist with ADEA claims whose financial redress Congress has carefully limited to specific damage elements, *see* **29 U.S.C. §§ 626**(b) (1976); *Kelly v. American Standard, Inc.,* 640 F.2d at 983 n. 14, is arguable, it is for Congress, not us, to decide whether state common law remedies trench too closely on the federal scheme. Pendent jurisdiction, of course, is a doctrine of discretion. We recognize that in appropriate circumstances dismissal of the state claims without prejudice is proper. *United Mineworkers v. Gibbs,* **383 U.S. 715**, 726-27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Such circumstances may exist, for example, where the trial judge finds that the state issues predominate in terms of the comprehensiveness of the remedy sought, or that there is a sufficient likelihood of jury confusion in treating divergent legal theories of relief to justify separating state and federal claims. *Id.* 24] *Notice* [25] I. Magnin contends that it did not have notice of plaintiffs' claims for *tort* (as opposed to *contract*) damages flowing from a breach of the implied covenant. Although the general verdict prevents us from determining with certainty the amount of punitive damages, they necessarily make up a significant portion of the award.**[fn8]** But the complaint alleging breach